# Facsimile Cover Sheet

**KELEHER & McLEOD, PA**
PO Box AA
Albuquerque, NM 87103
Telephone: (505)346-4646
Facsimile: (505)346-1370

To:
Company:
Fax Number: 3482028

From: E4381
Fax Number:
Voice Phone:

Sent: 3/11/2022 15:04:05
Pages: 44

Subject:

Message:

JHKM | JENNINGS HAUG KELEHER MCLEOD

PO Box AA
Albuquerque, NM 87103
Telephone: (505)346-4646
Facsimile: (505)346-1370

Date: March 11, 2022

| To: | Company: | Fax No.: |
| --- | --- | --- |
| | | |

1446(b)(1).

5.      The District of New Mexico is the proper district for removal because this district

encompasses the County of Santa Fe and is therefore "the district and division embracing the place

where such action is pending." 28 U.S.C. § 1441(a).

are a prior complaint which has never been served, and a return of service summons. Those are attached as Exhibit C.

Dated: March 11, 2022

Respectfully submitted,

By /s/ Cassandra R. Malone
T.J. Mitchell
Cassandra R. Malone
JENNINGS HAUG KELEHER MCLEOD LLP
201 3rd Street, NW, Suite 1200
Albuquerque, NM 87102

FILED 1st JUDICIAL DISTRICT COURT
Santa Fe County
2/4/2022 3:39 PM
KATHLEEN VIGIL CLERK OF THE COURT
Liliana M Villalobos

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

STEVEN MARTINEZ,

Plaintiff,

vs. No. D-101-CV-2021-01888 KME

QUAIL RUN ASSOCIATION, INC.,
And DALE STETSON, former General
Manager of Quail Run, individually and
In his individual capacity.

Defendant.

## FIRST AMENDED COMPLAINT FOR DAMAGES

COMES NOW Steven Martinez, hereinafter referred to as "Plaintiff", by and through his attorney of record, George Geran of the Law Office of George Geran and hereby submits the following as his First Amended Complaint for Damages. The Complaint has not been served yet, and thus the amendment is as of right, pursuant NMRCP 15.

## JURISDICTION, VENUE AND PARTIES

1) At all times material to this complaint, Plaintiff Martinez was a resident of San Miguel County, State of New Mexico and an employee or former employee of the Defendant Quail Run Association, Inc, which is in Santa Fe County, New Mexico at 3101 Old Pecos Trail Santa Fe, NM 87505. Mr. Martinez is a New Mexico native who is of Hispanic descent. All relevant actions, to the best of Plaintiff's knowledge, took place in Santa Fe County.

2) Defendant Quail Run Association, Inc. is a condominium association related to home-owning and renting, and social and recreational activities provided in the gated community. The Association's website advertises it is a place for "Exceptional People." Plaintiff worked there for about 30 months. The Association regularly advertises itself as having

EXHIBIT
A

265 condominiums within the community. Plaintiff believes the vast majority of persons (perhaps 95% or more) residing in Quail Run are Anglo, the Board managing the Association's various businesses (all Board Members residing, at least part-time, in Quail Run proper) is wholly Anglo, and the vast majority of the management team is Anglo as well. Defendant Quail Run Association, Inc. employs more than 80 employees in conducting its business or businesses. Defendant Quail Run Association, Inc. is an "employer" pursuant the relevant statutes. Defendant Quail Run Association, Inc. conducts business throughout New Mexico, and the United States.

3) Defendant Dale Stetson is an individual who was employed by Quail Run throughout Plaintiff Martinez' employment as the General Manager of Quail Run and was Plaintiff Martinez' indirect supervisor throughout that employment. At all times relevant to the Complaint, Defendant Dale Stetson was a resident of Santa Fe County, New Mexico. Shortly after the termination of Plaintiff Martinez, upon information and belief, Defendant Stetson either resigned or was terminated by Defendant Quail Run, related to the mishandling of Plaintiff Martinez' termination and complaints of discrimination. Since that time, he may have moved his residence to Hawaii

4) This Court has personal and subject-matter jurisdiction over the parties, and the amount of damages sought herein is in excess of the jurisdictional minimum of this Court. Venue is appropriate herein as well.

## FACTUAL ALLEGATIONS

5) Defendant Quail Run Association, Inc. manages the Quail Run development at the north edge of the City of Santa Fe's Boundaries, and employs very nearly 100 employees, with only one current Hispanic Manager, immediately following the termination of Mr. Martinez.

Because Defendant's workforce has historically had a high percentage of Hispanic workers, racial, national-origin and skin color equity would suggest that the management team should reflect the workforce. At the time of Plaintiff Martinez' termination Defendant had an all-Anglo Board, an Anglo General Manager, an Anglo Business Manager; an Anglo Housekeeping Manager; an Anglo Recreation Manager; an Anglo Food Service Manager; an Anglo Bar and Grill Manager; a Facilities Manager, who Mr. Martinez believes may be Native American; and Mr. Martinez's brother (who is Hispanic like Mr. Martinez) as a Grounds Manager. The racial, national origin, and skin color imbalance in Defendant's management staff creates operational issues because senior management was and is isolated culturally and socially as well as often, by language, from the concerns of its staff.

6) Similarly, though Quail Run has many employees, at the time of Mr. Martinez's termination it had no Human Resources Manager, and thus no one in charge of directly and knowledgably supervising the legality of its hiring, termination, promotional, compensation and discipline practices. Regular Human Resources procedures like internally auditing its discipline, hiring, compensation and promotional choices would have provided direct knowledge and updates of its practices to heal the racial/color/national origin divide within its staff.

7) Mr. Martinez was originally hired as a maintenance or engineering crew member in the Fall of 2018. This was following Mr. Martinez' retirement from long-time State employment, most recently and for the last five years of his 20 year State career, as a Maintenance Director for the New Mexico Corrections Department, where he had 20 years doing exactly what he thought one day he would be doing for Quail Run -- but on a much bigger scale. He supervised 5 Maintenance supervisors of the various physical facilities the Corrections Department operates in Santa Fe County, meaning chiefly all the prisons and offices associated

with the prisons. The total staff under his direct and indirect supervision exceeded 30 employees, and he had full authority to hire, discipline, and direct his staff.

8) On or about June 5, 2019 – perhaps after six months of working for Quail Run, he was promoted to Maintenance or Engineering Department Manager, where he ostensibly managed a crew of 10 to 12 workers, a department where typically 4 out of 5 employees are Hispanic. The previous Maintenance Manager was Tim Romero, and Mr. Romero is believed to be of Hispanic descent, and like Plaintiff Martinez was of darker skin color than all other managers at Quail Run except for Mr. Martinez' brother, who again is of darker skin color than all other managers at Quail Run. Mr. Romero, during his approximately six months as Mr. Martinez' direct supervisor, told Plaintiff Martinez several times that then-Facilities Manager David Pfeiffer did not like Mr. Romero, and that Mr. Pfeiffer would not let him manage his own department. The actual cause of Mr. Romero's end of employment is unknown to Plaintiff Martinez, as Romero simply did not come to work one day, and then-Facilities Manager Pfeiffer announced that Mr. Romero would not be returning. Shortly thereafter, Plaintiff Martinez was named as Mr. Romero's replacement, as Plaintiff Martinez' expertise with all jobs and tasks the Department performed, and his ability to manage his employees were long-standing skills of Plaintiff Martinez, following his State career.

9) A few months before, Mr. Pfeiffer had placed a photo of a monkey with his name "Steve" under it on the computer screen of the digital time clock where all his then co-employees and Plaintiff Martinez would punch in at the same time. Plaintiff Martinez took a slightly blurry photo of that screen as soon as he saw it and kept it in his phone. The photo's digital properties show he took the photo on April 15, 2019,at 12:02 pm. Mr. Martinez was still inputting his data into the digital clock, with his co-employees surrounding him, when the photo popped up on the

screen, and his first notice of the photograph's presence was a burst of laughter from all his co-employees. He questioned his co-employees about the photo, and they told him that Mr. Pfeiffer had created the photo and placed it within the digital program, something his co-employees found humorous for a long time, particularly after Plaintiff Martinez became their supervisor less than two months later. In retrospect, Plaintiff Martinez realized that Mr. Pfeiffer's admitted action in equating Plaintiff Martinez with a monkey was likely provoked by Mr. Pfeiffer's discomfort with having an Hispanic laborer with similar credentials to his own, as Mr. Pfeiffer had previously been the Santa Fe City Facilities Manager.

10) Plaintiff Martinez then complained to his direct supervisor, Pfeiffer, about the photo on the screen, and Pfieffer admitted that he placed the photo on top of Plaintiff's ISolved Pay Day HCM (the Application Quail Run uses to manage payroll) profile to create the photo, and he began laughing indicating that he thought it was funny and a joke. Plaintiff Martinez told him immediately it was no joke and asked him to please remove it (because only senior management had access to that part of the timekeeping program) however, Pfeiffer never took the photo off Mr. Martinez' input screen. Furthermore, after a day or two of inaction, Plaintiff Martinez also complained about the photo to Mr. Pfieffer's supervisor, Defendant Stetson. Stetson told him that he would take care of it, but the photo remained on the screen for another week, so Plaintiff Martinez went back to him, and complained of the photo to him again. Nevertheless, both Plaintiff Martinez' direct supervisor and Quail Run's General Manager kept the monkey photo on Plaintiff Martinez' digital time keeping screen up and until his last day at Quail Run in May, 2021, more than two years later.

11) Mr. Martinez reports that the hiring practices in his former Department (the hiring has always been done by the Facilities Manager) are discriminatory as well. Immediately before

his termination, four Hispanic employees of the Maintenance Department were terminated for

being undocumented workers (another Human Resources issue).  Quail Run hired three

employees to replace the four Hispanic workers, (a change that left Plaintiff Martinez with little

or no time to directly supervise any of the work, as Mr. Martinez was a manager in name, but not

in job function).  Two of those employees were Anglo, though Mr. Martinez reports that the

applicant pool for the Maintenance Staff is regularly something like 90% Hispanic.  As well,

during Plaintiff Martinez' conversations with Defendant Stetson and then-Facilities Manager

Pfieffer about the staffing and pay of Martinez' subordinates, Defendant Stetson told him that he

favored computer literate and English-speaking and reading employees (which Plaintiff Martinez

explicitly stated to each manager was irrelevant to the positions the employees would be

working, and began to suspect was discrimination against Hispanics, all immigrants, and persons

with darker skin).

     12)     Further, Plaintiff Martinez worked briefly in the position of Facilities Manager as

well as Maintenance Manager several months before his termination for a made-up reason in

May 2021.  In November 2020, then-and long-time Facilities Manager David Pfeiffer resigned.

From the date of former Facilities Manager Pfieffer's resignation until approximately January

2021, Plaintiff Martinez served as the Facilities Manager addressing administrative tasks for

essentially the first time.  Plaintiff Martinez requested additional compensation for the additional

work and was offered one week of vacation for some two months of additional responsibilities.

Plaintiff Martinez refused and secured $2500 for the additional work.  During the time that

Plaintiff Martinez worked as Facilities/Maintenance Manager he worked supervising a full

underground garage lighting project (originally budgeted at $50,000) for $10,000, completed

recertification of the pool with the Environment Department, oversaw contractors related to a

roofing project, and supervised a contractor regarding a mold remediation issue. All work was completed timely and successfully. Nevertheless, when Plaintiff Martinez applied for the open permanent position he was currently working in on a temporary basis, he was refused the opportunity of an interview and Native American James Lente was hired. Mr. Lente has less-dark skin then Plaintiff Martinez, and less experience and expertise in facility management than Plaintiff Martinez.

13)     Plaintiff Martinez knows that throughout his time with Defendant Quail Run Association, Inc. he was treated differently because he was one of the few Hispanic managers at Quail Run, and that different treatment resulted in:

a)      lower pay than the other mostly Anglo supervisors;

b)      different, and illegal, standards for determining his pay (see FLSA claim below);

c)      different work standards than were enforced against the Anglo Managers, including specifically being treated differently in the management authority he was given (none) and the tasks he performed (he never worked as, or was truly regarded as, a manager);

d)      routinely having his recommendations and decisions ignored by senior management, as they essentially ran his department for him, despite his on-going and always-demonstrated full competency to do so;

e)      Defendants refusal to interview him, despite his long-term demonstrated competency in the field of Facilities Management, for the open Facilities Management position, and not hired for the open position, despite working successfully as the Acting Facility Manager, having better experience and training (by information and belief) than the successful outside applicant, Mr. Lente, and despite the fact that both Defendants had previous experience with Plaintiff Martinez, and none with Mr. Lente.

     f)     the monkey photo which remained up (and a daily reminder of management's disdain for him) despite three explicit, no-nonsense complaints regarding the matter;

     g)     turning a long-time, established manager and supervisor with expertise at Facilities Management, and turned him into a laborer;

     h)     in other means and manners.

This habitual different and disrespectful treatment eventually ripened into the Defendants' termination of him on May 21, 2021 for a non-offense no Anglo manager would have even been criticized for. All the above factors contributed to the pervasive and continuously hostile work environment endured by Plaintiff Martinez.

     14)     Plaintiff Martinez was eventually terminated because four of his supervisees (not himself, as he was excused from work and was driving his wife to and from her once every two week or so Multiple Sclerosis massage appointment on April 19, 2021) apparently or allegedly staged a walk-out from work to make some unknown point in the worst possible way. Plaintiff Martinez' wife's massage appointments are scheduled on an as-needed basis whenever she begins to have signs of lack of muscle control. This occurs regularly, some one to three weeks after the last massage appointment, but the need for the appointment is determined by his wife's body. The massages help her M.S. as it gives her nervesstimulus from her skin and muscles (not her brain), and thus, helps her neural connections to be made successfully. The process of un-numbing deadened nerves is quite painful for Maria Martinez, and the treatments render her temporarily unable to drive herself home from the appointments. Mrs. Martinez told Plaintiff Martinez that she needed a massage appointment soon on the evening of April 15, the appointment was arranged on April 16, and Plaintiff Martinez secured permission to miss work from Mr. Lente onApril 17 to drive his wife to and from the appointment on April 19. This had

nothing to do with any walk-out and has been something the Martinez's did regularly throughout his employment by Quail Run.

15) After he had secured his day off, his supposed supervisees Tim Garcia and Ruben Montoya came to him and told him they were not coming into work Monday. Plaintiff Martinez heard them and told the two "I don't care" because he was trying to convey the two were speaking nonsense. He obviously did care about the attendance of his staff, but at the time he did not understand the conversation well. He half-thought the two were making a bad joke. He half-thought if the two did not show up for work on Monday, he would discipline them (or rather try to get Lente and/or Stetson to discipline the two, as Plaintiff Martinez was never allowed to discipline his staff without decision-making input from Lente, Pfeiffer, or Stetson. That was the end of the conversation, and he now realizes he should have initiated discipline on the spot by going to Lente or Stetson. He was hoping that Mr. Garcia and Mr. Montoya did not mean what they said, and thought that by actively and directly ignoring them, they would come to their senses. He now realizes that response was an error of judgment, but he honestly expected both men would be at work Monday. Neither Mr. Garcia nor Mr. Montoya told Plaintiff Martinez the reason for their scheme, nor that they were securing other workers' participation. He flatly denies any direct or indirect involvement or knowledge of the walk-out, and does not know why the walk-out occurred.

16) Immediately following the April 19 walk-out of four employees, Defendant Stetson told Plaintiff Martinez that he was not upset about the walk-out and wanted to pay for his crew's lunch. Nevertheless, the matter was investigated, and allegedly found – without any basis in fact – that Plaintiff Martinez had instigated and organized the walk-out. It is clear from the sequence of Quail Run's decision-making process that:

a) The investigation never developed sufficient facts for Mr. Stetson and the Board to make accurate decisions regarding that April 19 walk-out. The investigation (convened with the event and concluded by April 21) artificially shut down without conclusive evidence, which could have been cured by bringing in other informed voices (not meaning former Facility Manager David Pfeiffer, who had resigned five months before the investigated events);

b) The investigation is also fatally flawed because Plaintiff Martinez was interviewed first, and neverconfronted with the totality of the information gathered during the investigation. Doing so would have given him more opportunity to contradict himself, and a direct reason to raise the issues addressed in his attorney's letters. It's also standard investigative procedure to re-interview the target of any investigation as the final act of the investigation;

c) Mr. Pfeiffer was apparently interviewed by the investigator as well, related to eventshe had no knowledge of because he resigned five months or more before April 19, 2021. In early November 2020, Plaintiff Martinez approached then-Quail Run Facilities Manager Pfeiffer related to information that Mr. Pfeiffer – who is the former Santa Fe City Facilities Manager and who resigned from that previous position after allegations of self-dealing emerged against him within City management. He had his house painted by Quail Run's painting contractor, Extreme Painting, in return for Mr. Pfeiffer's influence over the contracting decision. Plaintiff Martinez brought the allegation -- madeby an Extreme Painting employee -- to Mr. Pfeiffer out of loyalty and respect for the chain of command. Shortly after that conversation (meaning within the week), Mr. Pfeiffer had resigned his position with Quail Run. It is unknown at this point if Quail Run had contemporaneous notice of the free painting, but the inclusion of non-employee Pfeiffer in the investigative interview pool raises that concern, as well as confirming Plaintiff Martinez' belief of the retaliatory motivation underlying the investigation;

and

d) The investigation also suffered because the investigator was an English-only speaker,and several of the crew has little to no English-speaking skills.

With one hundred employees Quail Run needed in-house Human Resources direction, not outside contract help.

17) Plaintiff Martinez was terminated from his employment by Quail Run on or about May 25, 2021. At the heart of what happened onApril 19 is Quail Run's ignorance of the concerns of its Hispanic staff. ignorance of the character of the individual employees involved. and ignorance of the actual demands of the job Quail Run hired Plaintiff Martinez to perform. Plaintiff traces this back to the systemic discrimination in place at Defective Quail Run, reflected in a sight that confronts everyone attending every Board and Management meeting –it is simply a group of well-off Anglos insisting (without real knowledge or sensitivity) that another authority-less Hispanic babysit the staff Plaintiff Martinez worked among, rather than giving Plaintiff Martinez the tools to do a great job. The following non-exclusive list of factors led Plaintiff Martinez to conclude discrimination motivated his termination and lost promotion:

a) the near pure white permanent residents;

b) the resulting pure white Board;

c) the resulting near pure white management team;

d) his nearly all Hispanic work crew, and the Housekeeping Department's nearly all Hispanic work crew, managed by the only other Hispanic Manager at Quail Run when he was there; his brother who similarly manages the grounds Department with an all Hispanic crew.

e) an atmosphere of corruption at Facilities, which was present before he arrived,

and he tried unsuccessfully to oppose and correct;

f) a procedurally and substantively defective investigative report;

g) no on-site Human Resources supervision; and

h) evidence of discrimination pervading Quail Run's hiring, promotion, compensation, and discipline decisions, specifically including his own termination and lost promotion.

i) the change of management course and many management personnel after his attorney's letters of complaint;

j) the monkey photo with his name under it being placed on the time clock by my Anglo direct supervisor, and then never removed despite my complaints to both my direct supervisor and his Anglo supervisor, Mr. Stetson; and

k) in other means and manners.

18) With regard to Quail Run's retaliation against Plaintiff Martinez for complaints and opposition to Quail Run's discriminatory practices, the following non-exclusive list of factors evidence that retaliation:

a) his complaints about Quail Run's failure to promote him;

b) his complaints about paying his near-all-Hispanic work crew minimum or close to minimum wage, when many of that crew could command twice as much or more on the open Santa Fe market;

c) his complaints about the failure to take him and his supposed position seriously;

d) the acceptance of his attorney's complaints of discrimination -- evidenced by the change of course in management behavior which followed those complaints -- but the failure of Quail Run to re-hire him when his attorney suggested that to them;

e)      the failure of Quail Run to discipline Mr. Montoya or Mr. Garcia, despite the

apparent acceptance of my attorney's complaints; and

f)      calling former Quail Run Facilities Manager as a witness to an investigation of an

incident which occurred after I believe I secured his resignation from Quail Run because

he didnot want me to take my knowledge of his free paint job to Mr. Stetson.

19)      Mr. Stetson either resigned or was terminated immediately following Plaintiff

Martinez' (through counsel) complaint of discrimination against Hispanics – and though a

Human Resources Director was hired, and neither Mr. Montoya nor Mr. Garcia were promoted

(though immediately following Plaintiff Martinez' termination they were moved into his office,

the office for the Maintenance Manager) – he was not returned to work. Defendants terminated

no employees in the maintenance department other than Plaintiff Martinez related to the walk-out

incident, and instead -- again following Plaintiff's complaints about the lack of supervisory time

he had when Maintenance Manager -- had hired three new Maintenance workers. Finally, Mr.

Lente's assistant – Candy Grimes -- was terminated or resigned from her position shortly

thereafter as well.

20)      When replacing Plaintiff Martinez, Defendants chose Randy Sanchez, a Hispanic,

and when replacing Ms. Grimes chose Charmaine Garcia, a Hispanic, as well, following Plaintiff

Martinez' and counsel's repeated complaints of race, color and national origin discrimination

against Hispanics, persons of darker skin tone, and workers of other than United States' national

origin and ancestry. Mr. Sanchez left work with Defendant Quail Run within weeks of starting.

Charmaine Garcia resigned within a few months of starting work with Defendant complaining of

discrimination.

21)      Anglos give the orders within Quail Run, and Hispanics carry them out. Hiring

Hispanic supervisors within the two departments doing the most physical labor within the organization, then, is a symptom of the universal discrimination Quail Run inflicts upon Hispanic/Latinx employees. Any Hispanic supervisor, like Plaintiff Martinez, is hired and retained as a supervisor only if they can keep a lid on the effects of the discrimination on their primarily Hispanic employees. Because of Quail Run's failure to support Plaintiff Martinez' supervisory efforts and complaints of under-paying his crew, Plaintiff Martinez was unable to keep that lid clamped down. The "walk-out" and his termination, his lost promotion, the monkey photo, and the national origin, color, race and ancestry of his apparent replacement (who quit shortly thereafter) all derive from the same source – the near universal discriminatory treatment Hispanics suffer within Defendant Quail Run as a whole – from residents to Board to supervisors to employees. Instead of fixing the issues at maintenance, Defendant Quail Run perpetuated and intensified them by, first, promoting two of Plaintiff's supervisees who each have demonstrated histories of disloyalty and dishonesty which directly infected Defendant Quail Run's discipline process. Then after Plaintiff Martinez' attorney complained regarding the dishonesty and disloyalty of the two supervisee, decided to hire a new Hispanic manager for the primarily Hispanic department. And finally, by not being able to retain Plaintiff Martinez' Hispanic/Latinx replacement Randy Sanchez, or re-hiring Plaintiff.

## COUNT 1

### Violation of Federal Fair Labor Standards Act for Willful Failure To Pay Overtime to an Employee, 29 U.S.C.S. § 207

22) Each and every allegation set forth in the preceding paragraphs is incorporated by reference as if set forth fully herein.

23) Plaintiff Martinez was an employee of Quail Run Association, Inc. from November 2018 until May 25, 2021. On or about June 2019 Plaintiff Martinez was promoted to

Maintenance Manager for the large housing complex and supervised a crew of 13 maintenance workers thereafter. Plaintiff Martinez was directly supervised by Facilities Manager James Lente (Native American), and all discretionary decisions were entrusted to Mr. Lente in that role.

24) Plaintiff was never paid time-and-a-half overtime wages after his promotion to Maintenance Manager, and in fact, continued to computer-record his time, just as he did when a maintenance worker. The vast majority of Mr. Martinez' job duties and work remained the same after his promotion to Maintenance Manager. He did no scheduling, did no ordering, did no planning, had little to no role in any discipline decisions, did not decide when maintenance work would be performed, and in fact, did not see the work orders (submitted by residents and others) until they were given to him the morning the work was to be done. He did not even decide what crew member would do which assigned task on any day, and this specifically included the work he himself did. He did no hiring. He conducted no job interviews. He did inspect the work of his crew when it was done and signed off on the completion of the assigned tasks. He did provide an annual performance appraisal for each crew member and believes that task took up one day of work per year.

25) Ten percent of Plaintiff's time was taken up with administrative tasks, primarily approving days-off requests and approving the time records for each member of his crew every week. He did have an office, but unless the day was highly unusual, he did not spend more than 45 minutes in the office each day. He was compensated at very close to the rate of some of his "supervisees." Instead, he functioned as a Lead Worker for the maintenance crew, working ninety percent of each day performing maintenance tasks alone or with a member or two of his crew, like stuccoing, replacing doors and windows, replacing light fixtures and lightbulbs throughout the facility, moving furniture for residents, installing sky lights, painting porches and

decks, repairing and replacing garage doors, and general plumbing work for the Facility as a whole, and for the separate homes within Quail Run. He would also inspect and sign off for work done on the work orders performed by his crew.

26) Plaintiff Martinez did at times attempt to provide discretionary advice to Facilities Manager Lente and then-Quail Run General Manager Dale Stetson. At times he attempted to secure higher pay for his crew because the largely Hispanic crew was paid less than market rate for the work they did. The lack of pay produced discipline and retention issues. Every time he approached Mr. Lente and Mr. Stetson; they ignored his requests. Similarly, he expressed opinions to Lente and Stetson regarding discipline, and was ignored as well.

27) Because of the above facts, Plaintiff Martinez was an "employee" pursuant the applicable statutory definition, *see 29 U.S.C.S. § 203 (e) (1)*, and was eligible for none of the exceptions to the definition of "employee" expressed therein, including *29 U.S.C.S. § 213 (a) (1)*, the executive and administrative exemption, as he worked with his hands on the grounds and in the homes in the Quail Run development, preforming maintenance tasks, did not work in administration, and had little discretion in any of the decisions of the employer. Similarly, none of the exceptions to Quail Run being regarded as an "employer," are applicable herein. *See 29 U.S.C.S. § 203 (d)*.

28) Throughout his employment as the "Maintenance Manager," Plaintiff Martinez was never paid the requisite overtime rate of time-and-a-half. Specifically, much of his overtime was caused by snow and ice during the winters, and the resulting problem of providing safe passage along the streets and sidewalks of Quail Run. At other times, the overtime was due to emergency conditions arising within Quail Run, such as a sewer back-up. At all times

throughout his employment by Quail Run, Plaintiff Martinez was "on-call" status due to the potential of emergency conditions above.

29) None of Plaintiff Martinez's overtime hours were due to executive or office work. None of Plaintiff Martinez's overtime work was properly compensated to him, as he was always paid his hourly rate calculated on 40 hours a week, unless he was paid his hourly rate times the amount of hours worked, as in such circumstances he would be paid less than the salary rate of 40 hours times his hourly rate. Plaintiff Martinez believes he worked 100 to 200 hours of overtime per year throughout his time as the Maintenance Manager. Plaintiff Martinez believes the Defendant has time records for each and every day of that work. Plaintiff Martinez knows his paycheck fluctuated greatly from period to period, sometimes as much as $500 bi-weekly. Plaintiff Martinez knows that he was paid almost the same hourly rate as many of his "supervisees," who Mr. Martinez had almost no administrative or supervisory responsibility for.

30) At the same time, and despite Plaintiff Martinez being listed as "salaried" on his paycheck, his "salary" was not paid when he went on vacation, and Plaintiff Martinez was not compensated for the days he was not at work, beyond his accumulated Paid Time Off. Similarly, when Plaintiff Martinez did not work his full 40 hours in a week, he was only paid for the hours he worked, and not some fixed salary amount. Again, the pay and work records of Quail Run provide all known relevant information.

31) Because Mr. Martinez was designated as "salaried" on his paycheck, but never received a salary, Mr. Martinez states that all violations of the requirement that Mr. Martinez be paid time-and-a-half were willful and knowing, and done because of national origin discrimination against Mr. Martinez who at the time was one of two Hispanic "managers" at Quail Run.

WHEREFORE, Plaintiff prays for judgment against the Defendant, for his lost overtime and vacation time damages, the additional penalty of twice that amount, interest as allowed by law, attorney's fees, and costs, all in an amount to be determined at trial, plus such other and further relief as the Court deems just and proper, including all allowed permanent injunctive relief including rehiring, appointment of a special master, and all other relief allowed by law.

**COUNT II.**

**Violation of the New Mexico Human Rights Act Against Both Defendants**

32) Plaintiff Martinez realleges and incorporates herein as if set forth in full by reference the allegations contained in paragraphs 1 through 31 above.

33) The New Mexico Human Rights Act (the "NMHRA"), NMSA 1978, §28-1-7 (A) makes it an unlawful and discriminatory practice for an employer to discriminate in the terms and conditions or privileges of employment because of a person's race, color or national origin.

34) An "employer" pursuant the NMHRA is not limited to present employment or present connection to the plaintiff. NMSA 1978, §28-1-2 (A)-(B). Further, it is an unlawful discriminatory practice for any person or employer to coerce, incite or aid the taking of any retaliatory actions against a plaintiff under the NMHRA. NMSA 1978, §28-1-7 (I)

35) Defendant Quail Run is both an employer and person covered by the NMHRA. Individual liability for discriminating and retaliating supervisors like Defendant Stetson is also covered by the NMHRA. Defendant Quail Run and Defendant Stetson both discriminated and retaliated against Plaintiff during his employment, created a hostile work environment for Plaintiff Martinez, and that environment continued through and motivated Defendants' termination of Plaintiff Martinez. For purposes of the prima facie discrimination standards,

Plaintiff Martinez' treatment by Defendants should be compared to Defendant Quail Run's predominantly Anglo managerial and supervisory employees.

36) Defendants created a hostile work environment in the means and manner alleged above for Plaintiff Martinez and other persons of color through the actions and inactions of the Defendants. At the same time, the Defendants have actively failed or refused to correct discriminatory and retaliatory behavior by themselves, and members of their staffs. Similarly, upon information and belief, Defendants never disciplined Defendant Stetson for his own acts in fostering a race/color/national origin-discriminatory hostile work environment, nor for his failures to good faith investigate and discipline the actions of Anglo supervisors. Defendant Quail Run discriminated and retaliated against Plaintiff Martinez as a "complaining person of color" up and through his discriminatory termination which involved the use of standards regularly ignored for Anglo supervisors.

37) Plaintiff Martinez was subject to a hostile work environment and was discriminated against in connection with the Quail Run's failure or refusal to deal with Plaintiff Martinez's complaints and concerns about his pay, his promotion opportunities, his non-management role, and different hiring, supervision, pay and discipline standards for persons of color, in violation of the NMHRA.

38) As a direct and proximate result of the actions and inactions of the Defendants, Plaintiff Martinez has suffered and will continue to suffer damages in an amount to be proved at trial, including termination, but not limited to damages for lost wages, humiliation, mental anguish, and emotional distress all in an amount to be proved at trial herein.

39) Plaintiff Martinez is also entitled to an award of reasonable attorney's fees and costs in connection with his claim of national origin/race/color discrimination and retaliation

under the NMHRA. Plaintiff Martinez filed his New Mexico Human Rights Bureau Charge against the Defendants related to all acts complained-of herein on January 19, 2022, and will amend this Complaint to plead the resulting, completed administrative exhaustion as soon as the Charge process is complete.

WHEREFORE, Plaintiff Martinez prays for judgment against the Defendants for compensatory damages, punitive damages, interest as allowed by law, and attorney's fees and costs, all in an amount to be determined at trial, plus such other and further relief as the Court deems just and proper.

**COUNT III**

**Breach of Contract Against Defendant Quail Run**

40) Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 39.

41) Plaintiff was employed by Defendant QUAIL RUN under a written, oral and/or implied contract of employment which was modified and re-enforced by certain policies, practices, assurances, and other express and implied statements of Defendants, including specifically policies in QUAIL RUN's employee handbook describing rights and promises pursuant QUAIL RUN's handling of the complaints and general employment of employees of color. In said contract, it was implicitly agreed that Plaintiff would not be impeded in her job duties, and explicitly agreed that he would be terminated only for just cause. Further said contract stated expressly that Mr. Martinez:

a) would not be discriminated against because of his race, national origin, or color;

b) would have the same opportunities as other employees for pay and advancement, including salaried vacation time;

c) would not be retaliated against for complaining of the discrimination against himself, or his employees

d) would not be ridiculed publicly because of his race/national origin/color; and

e) in other means and manners.

Plaintiff entered into said contract, *inter alia*, to secure peace of mind and financial stability, and refrained from seeking employment elsewhere in reliance thereon.

42) At all times material hereto, Plaintiff performed his obligations under his contract with Defendants. Defendants breached their express, implied, and promissory estoppel contractual commitments to Plaintiff by terminating his employment without proper cause, by repeatedly violating the law in handling his pay, and by terminating him for a fictional reason as described above.

43) At the time the parties entered into the contract, as alleged herein above, it was known and understood, and within the reasonable contemplation of the parties, that in the event of a breach, Plaintiff would suffer present and future loss of earnings as a foreseeable and probable result thereof. Further it was known and understood, and within the reasonable contemplation of the parties, that in the event of a breach, Plaintiff would suffer present and future emotional distress as a foreseeable and probable result thereof.

44) As a direct and proximate result of Defendants' knowing and intentional breach of the contract, Plaintiff in fact has suffered loss of wages and benefits and emotional distress, the full extent and nature of which are presently unknown to him. Plaintiff will therefore seek leave of Court to amend this complaint at such time as these damages are fully ascertained. Plaintiff claims punitive damages based on the intentional nature of these violations

**COUNT IV**

**Breach of the Covenant of Good Faith and Fair Dealing against Quail Run**

45) Plaintiffs reallege and incorporate herein as if set forth in full by reference the allegations contained in paragraphs 1 through 44, above.

46) Plaintiffs and Defendant Quail Run entered into a written, oral and/or implied employment contract upon Plaintiff's hiring and during the term of Plaintiff's employment. The basic terms of the agreement provided that Plaintiff's employment would be secure as long as his performance was satisfactory, that Plaintiff would not be impeded in his performance or career expectations, that Plaintiff would not be terminated without good cause, that Plaintiff would earn agreed-upon wages and fringe benefits; that complaints of fraud, retaliation and discrimination would be investigated and addressed; that fraud, retaliation and discrimination would be disciplined; and other specific policies to be named later.

47) Plaintiff undertook and continued employment, and duly performed all of the conditions of the employment agreement. Plaintiff has at all times been ready, willing and able to perform all of the conditions of the agreement to be performed by Plaintiff.

48) From 2018 through the present, the Defendant, through its individual supervisors, has repeatedly breached the covenant of good faith and fair dealing by terminating Plaintiff without good or just cause, by making misrepresentations of material fact about the basis for terminating Plaintiff, by refusing to promote Plaintiff, and by failing to secure Plaintiff Martinez suitable employment where Plaintiff would have management job responsibilities. Specifically, Defendant Quail Run had an affirmative obligation to immediately and in good faith investigate Plaintiff's complaints and to treat him the same as other non-Hispanic managers.

49) Plaintiff performed all conditions precedent to Defendant's performance of its obligations under the contract. Plaintiff's performance was at all times satisfactory.

50) The law imposed a duty on the Defendant in connection with the employment agreement to act fairly and in good faith towards Plaintiff. Defendant covenanted to give full cooperation to Plaintiff in his performance under the employment agreement and to refrain from any act which would prevent or impede any of the conditions of the employment agreement from being performed, which would deny the employment agreement or which would prevent Plaintiff from receiving the benefits of the employment agreement, or would harm Plaintiff in connection with the performance of Plaintiff's duties pursuant that contract, or prevent Plaintiff from securing damages for such harms.

51) At the time the parties entered into the contract and resulting covenant, as alleged herein above, it was known and understood, and within the reasonable contemplation of the parties, that in the event of a breach, Plaintiff would suffer loss of earnings and economic damage and emotional distress. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered loss of earnings and economic damage and emotional distress in an amount according to proof but exceeding the jurisdictional minimum of this Court.

**COUNT V**

**Wrongful Termination in Violation of Public Policy And Retaliatory Discharge Against Both Defendants**

52) Plaintiff repeats and realleges by reference each and every allegation contained in the paragraphs above and incorporate the same herein as though fully set forth.

53) Plaintiff was ridiculed in the performance of his job duties, lost an earned promotion, was paid pursuant different illegal standards, and had his regular job of Quail Run Maintenance taken from him, was terminated without cause, and subjected to discrimination, when he repeatedly pursued his rights to a discrimination-free workplace for himself and his employees. The actions of Defendants represent retaliation for pursuing his legal rights, as well

as retaliation for complaining of discrimination at Quail Run and fraudulent behavior by other employees. Plaintiff's complaints were made for the purpose of protecting himself and his workers from on-going discrimination and fraudulent practices of Defendants, and retaliation for his on-going and regular complaints on behalf of himself and his crew were motivating factors in his termination. Defendants have offered other reasons for such discipline actions, harassment, and the denial of promotion related to Mr. Martinez' complaints. All such other reasons for the negative employment actions are pretext.

54) It is the public policy of the State of New Mexico as expressed in the New Mexico Human Rights Act, N.M.S.A. 1978, §28-1-1 *et. seq*, that an employer may not discriminate in the terms and conditions or privileges of employment because of a person's race/national origin/color or to retaliate for complaining of such discrimination, and in the common law that individuals shall not be retaliated against and discriminated against in their employment on the basis of their complaints of discrimination and harassment of themselves and others, nor on the basis of hiring a lawyer to secure his legal rights.

55) The actions, as well as the inactions, of the Defendants comprised a breach of the defendants' duty to provide a safe work environment to Plaintiff free from breaches of contract, discrimination, and retaliation.

56) The actions and inactions of Defendants had the effect of causing and worsening the alleged conduct, as the supervisory and policy-making employees of the Defendants knew and consciously disregarded the risk of discrimination, retaliation, and termination of Plaintiff Martinez by the Defendants, and thus had the effect of encouraging the involved conduct. Despite the knowledge of this risk, the supervisory and policy-making supervisors took no corrective action, and failed to institute procedures, disciplinary action, or training to eliminate

the risk of the behavior alleged herein. Specifically, Defendant knew or should have known that

Defendant Stetson would terminate plaintiff Martinez without cause, deprive him of the benefits

of his contract, and retaliate against Plaintiff Martinez, and failed to act to replace, train, or

adequately supervise the involved employees.

57)     Defendants negligently failed to operate and maintain employment conditions so

that the following dangerous conditions were created by their negligence towards Plaintiff

Martinez and Quail Run's other employees:

    a)     discrimination against employees because of their race/national origin/color,

    b)     retaliatory terminations without just cause against employees who complained of

discrimination, or because they hired a lawyer to secure their legal rights;

    c)     ensuring that contracts and quasi-contractual arrangements were honored; and

    d)     by other failures to operate and maintain office premises in means and manners

that will be more specifically identified later.

    58)     Defendant Quail Run's retention of the individual supervisor Stetson, and its

failure to act to train, investigate, and supervise him appropriately and non-negligently

affirmatively and proximately caused Plaintiff financial and emotional injury.

    59)     Defendant Quail Run's wrongful retention of the individual supervisor, failure to

ensure that Defendant operated pursuant its own policies and procedures, lack of effective

supervision and procedures, lack of a complete investigation, and failure to secure all evidence

amounted to a complete failure to address and prevent the conduct of Defendants and constituted

a custom, pattern, practice and policy of negligence regarding the welfare of Plaintiff and other

employees of color and/or complaining employees.

60) As a direct and proximate result of Defendants' actions, Plaintiff has suffered and will continue to endure pain and suffering, increased disability, economic injury and extreme and severe mental anguish and emotional distress; he has incurred and will incur medical expenses in the future for treatment by psychotherapists and other health professionals, and for other incidental expenses; and he will and has suffered a loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial. Further Defendants' actions were knowing and intentional and taken with specific discriminatory and retaliatory intent. Therefore, the Plaintiff is entitled to punitive damages in an amount to be proven at trial.

**GENERAL PRAYER FOR RELIEF AS TO ALL COUNTS**

**WHEREFORE**, Plaintiff requests that this Court:

a. Adjudge and decree that Defendants violated the Plaintiff's civil rights, and acted in a manner to harm Plaintiff, and have done so willfully and intentionally;

b. Award against Defendants, and in favor of Plaintiff, compensatory damages sufficient to compensate Plaintiffs for his humiliation, suffering and other injuries that Defendant's wrongful actions has caused, specifically including:

i) backpay, specifically including double lost overtime pay pursuant the FLSA claim;

ii) loss of fringe benefits, including paid vacation;

iii) loss of future earnings and future lost benefits, like loss of pension benefits;

iv) emotional distress damages;

v) medical and psychological expenses;

        vi) future medical and psychological expenses;

vii) loss of household services;

viii) loss of enjoyment of life;

ix) reputational damage, specifically including, but not limited to, damage to job-securing abilities wrought by discriminatory termination; and

x) any other damages which this Court deems fit and proper.

c. Award against Defendants, and in favor of Plaintiff, compensatory damages sufficient to compensate Plaintiff for the bad faith and discriminatory actions of Defendant, including compensation for lost past and future income, lost benefits, and job opportunities, together with interest thereon, in an amount to be determined;

d. Award against Defendants, and in favor of Plaintiffs, punitive damages sufficient to punish Defendants and to deter Defendants from such willful, reckless, and fraudulent actions;

e. Award against Defendants, and in favor of Plaintiff, attorney fees and costs;

f. Award against Defendants, and in favor of Plaintiff, such other relief as the Court deems to be just and proper in the premises.

All told, Plaintiff's damages should exceed $300,000.

Respectfully submitted,

By /S/ George Geran
George Geran, Esq.
Law Office of George Geran
214-A Rabbit Road
Santa Fe, New Mexico 87508
Telephone No.: 505-983-1085
Fax No.: 505-955-1941
Email Address: Geranlaw@aol.com

Attorney for Plaintiff Martinez

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Steven Martinez

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
George Geran
Law Office of George Geran
214-A Rabbit Road

**DEFENDANTS**

Quail Run Association, Inc., and Dale Stetson, former General Manager of Quail Run, individually and in his

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Cassandra R. Malone, Jennings Haug Keleher McLeod LLP
T.J. Mitchell, Jennings Haug Keleher McLeod LLP
P.O. Box AA

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)* Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**
Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☒ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. § 207

Brief description of cause:
Plaintiff asserts that Defendant violated the Fair Labor Standards Act, 29 U.S.C. § 207

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ $300,000 or more

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions)*:

JUDGE DOCKET NUMBER

DATE SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # AMOUNT APPLYING IFP JUDGE MAG. JUDGE

EXHIBIT

B

FILED 1st JUDICIAL DISTRICT COURT
Santa Fe County
8/30/2021 3:13 PM
KATHLEEN VIGIL CLERK OF THE COURT
Johnny Enriquez-Lujan

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

STEVEN MARTINEZ,

**Plaintiff,**

Case assigned to Ellenwood, Kathleen McGarry

vs. No. D-101-CV-2021-01888

QUAIL RUN ASSOCIATION, INC.,

**Defendant.**

**COMPLAINT FOR DAMAGES FOR FLSA VIOLATION**

**COMES NOW** Steve Martinez, hereinafter referred to as "Plaintiff", by and through his attorney of record, George Geran of the Law Office of George Geran and hereby submits the following as his Complaint for Damages.

**JURISDICTION, VENUE AND PARTIES**

1) At all times material to this complaint, Plaintiff Martinez was a resident of San Miguel County, State of New Mexico and an employee or former employee of the Defendant Quail Run Association, Inc, which is located in Santa Fe County, New Mexico at 3101 Old Pecos Trail Santa Fe, NM 87505. Mr. Martinez is a New Mexico native who is of Hispanic descent. All relevant actions, to the best of Plaintiff's knowledge, took place in Santa Fe County.

2) Defendant Quail Run Association, Inc. is a condominium association related to home-owning and renting, and social and recreational activities provided in the gated community. The Association's website advertises it is a place for "Exceptional People." Plaintiff worked there for some 30 months. The Association regularly advertises itself as having 265 condominiums within the community. Plaintiff believes

EXHIBIT
C

the vast majority of persons (perhaps 95% or more) residing in Quail Run are Anglo, the Board managing the Association's various businesses (all Board Members residing, at least part-time, in Quail Run proper) is wholly Anglo, and the vast majority of the management team is Anglo as well. Defendant Quail Run Association, Inc. employs more than 80 employees in conducting its business or businesses. Defendant Quail Run Association, Inc. is an "employer" pursuant the relevant statutes. Defendant Quail Run Association, Inc. conducts business throughout New Mexico, and the United States.

**FACTUAL ALLEGATIONS**

3) Defendant Quail Run Association, Inc. manages the Quail Run development at the north edge of the City of Santa Fe's Boundaries, and employs very nearly 100 employees, with only one current Hispanic Manager, immediately following the termination of Mr. Martinez. Because Defendant's workforce has historically had a high percentage of Hispanic workers, racial and national-origin equity would suggest that the management team should reflect the workforce. At the time of Plaintiff Martinez' termination Defendant had an all Anglo Board, an Anglo General Manager, an Anglo Business Manager; an Anglo Housekeeping Manager; an Anglo Recreation Manager; an Anglo Food Service Manager; an Anglo Bar and Grill Manager; a Facilities Manager, who Mr. Martinez believes may be Native American; and Mr. Martinez's brother (who is Hispanic like Mr. Martinez) as a Grounds Manager. The racial and national origin imbalance in Defendant's management staff creates operational issues because senior management was and is isolated culturally and socially as well as often, by language, from the concerns of its staff.

4) Similarly, though Quail Run has many employees, at the time of Mr. Martinez's termination it had no Human Resources Manager, and thus no one in charge of directly and knowledgably supervising the legality of its hiring, termination, promotional, compensation and discipline practices. Regular Human Resources procedures like internally auditing its discipline, hiring, compensation and promotional choices would have provided direct knowledge and updates of its practices to heal the racial/national-origin divide within its staff.

5) Mr. Martinez reports that the hiring practices in his former Department (the hiring has always been done by the Facilities Manager) are discriminatory as well. Immediately before his termination, four Hispanic employees of the Maintenance Department were terminated for being undocumented workers (another Human Resources issue). Quail Run hired three employees to replace the four Hispanic workers, (a change that left Plaintiff Martinez with little or no time to directly supervise any of the work, as Mr. Martinez was a Manager in name, but not in job function). Two of those employees were Anglo, though Mr. Martinez reports that the applicant pool for the Maintenance Staff is regularly something like 90% Hispanic.

6) Further, Plaintiff Martinez worked briefly in the position of Facilities Manager as well as Maintenance Manager several months before his termination for a made up reason in May, 2021. In November, 2020, then-and long-time Facilities Manager Steven Pfeiffer resigned. From the date of his resignation until approximately January 2021 Plaintiff Martinez served as the Facilities Manager addressing administrative tasks for essentially the first time. Plaintiff Martinez requested additional compensation for the additional work, and was offered one week of vacation for several

months of additional tasks. Plaintiff Martinez refused and secured $2500 for the additional work. During the time that Plaintiff Martinez worked as Facilities/Maintenance Manager he worked supervising a full underground garage lighting project, budgeted at $50,000 for $10,000, completed recertification of the poll with the Environment Department, oversaw contractors related to a roofing project, and supervised a contractor regarding a mold remediation issue. All work was completed timely and successfully. Nevertheless, when Plaintiff Martinez applied for the position he was currently working in, he was refused the opportunity of an interview and Native American James Lente was hired.

**COUNT I**

**Violation of Federal Fair Labor Standards Act for Willful Failure To Pay Overtime to an Employee, 29 U.S.C.S. § 207**

7) Each and every allegation set forth in the preceding paragraphs is incorporated by reference as if set forth fully herein.

8) Plaintiff Martinez was an employee of Quail Run Association, Inc. from November 2018 until March 23, 2021. On or about July, 2019 Plaintiff Martinez was promoted to Maintenance Manager for the large housing complex, and supervised a crew of 13 maintenance workers thereafter. Plaintiff Martinez was directly supervised by Facilities Manager James Lente (Native American), and all discretionary decisions were entrusted to Mr. Lente in that role.

9) Plaintiff was never paid time-and-a-half overtime wages after his promotion to Maintenance Manager, and in fact, continued to computer-record his time, just as he did when a maintenance worker. The vast majority of Mr. Martinez' job duties and work remained the same after his promotion to Maintenance Manager. He did no

scheduling, did no ordering, did no planning, had little to no role in any discipline
decisions, did not decide when maintenance work would be performed, and in fact, did
not see the work orders (submitted by residents and others) until they were given to him
the morning the work was to be done. He did not even decide what crew member would
do which assigned task on any day, and this specifically included the work he himself
did. He did no hiring. He conducted no job interviews. He did inspect the work of his
crew when it was done, and signed off on the completion of the assigned tasks. He did
provide an annual performance appraisal for each crew member, and believes that task
took up a day of work per year.

    10)    Ten percent of Plaintiff's time was taken up with administrative tasks,
primarily approving days-off requests and approving the time records for each member of
his crew every week. He did have an office, but unless the day was highly unusual he did
not spend more than 45 minutes in the office each day. He was compensated at very
close to the rate of some of his "supervisees." Instead, he functioned as a Lead Worker
for the maintenance crew, working ninety percent of each day performing maintenance
tasks alone or with a member or two of his crew, like stuccoing, replacing doors and
windows, replacing light fixtures and lightbulbs throughout the facility, moving furniture
for residents, installing sky lights, painting porches and decks, repairing and replacing
garage doors, and general plumbing work for the Facility as a whole, and for the separate
homes within Quail Run. He would also inspect and sign off for work done on the work
orders performed by his crew.

    11)    Plaintiff Martinez did at times attempt to provide discretionary advice to
Facilities Manager Lente and then-Quail Run General Manager Dale Stetson. At times

he attempted to secure higher pay for his crew because the largely Hispanic crew was paid less than market rate for the work they did. The lack of pay produced discipline and retention issues. Every time he approached Mr. Lente and Mr. Stetson, they ignored his requests. Similarly, he expressed opinions to Lente and Stetson with regard to discipline, and was ignored as well.

12) Because of the above facts, Plaintiff Martinez was an "employee" pursuant the definition, see 29 U.S.C.S. § 203 (e) (1), and was eligible for none of the exceptions to the definition of "employee" expressed therein, including 29 U.S.C.S. § 213 (a) (1), the executive and administrative exemption, as he worked with his hands on the grounds and in the homes in the Quail Run development, preforming maintenance tasks, did not work in administration, and had little discretion in any of the decisions of the employer. Similarly, none of the exceptions to Quail Run being regarded as an "employer," are applicable herein. See 29 U.S.C.S. § 203 (d).

13) Throughout his employment as the "Maintenance Manager," Plaintiff Martinez was never paid the requisite overtime rate of time-and-a-half. Specifically, much of his overtime was caused by snow and ice during the winters, and the resulting problem of providing safe passage along the streets and sidewalks of Quail Run. At other times, the overtime was due to emergency conditions arising within Quail Run, such as a sewer back-up. At all times throughout his employment by Quail Run, Plaintiff Martinez was "on-call" status due to the potential of emergency conditions above.

14) None of Plaintiff Martinez's overtime hours were due to executive or office work. None of Plaintiff Martinez's overtime work was properly compensated to him, as he was always paid his hourly rate calculated on 40 hours a week, unless he was

paid his hourly rate times the amount of hours worked, as in such circumstances he would

be paid less than the salary rate of 40 hours times his hourly rate. Plaintiff Martinez

believes he worked 100 to 200 hours of overtime per year throughout his time as the

Maintenance Manager. Plaintiff Martinez believes the Defendant has time records for

each and every day of that work. Plaintiff Martinez knows his paycheck fluctuated

greatly from period to period, sometimes as much as $500 bi-weekly. Plaintiff Martinez

knows that he was paid almost the same hourly rate as many of his "supervisees," who

Mr. Martinez had almost no administrative responsibility for.

15)     At the same time, and despite Plaintiff Martinez being listed as "salaried"

on his pay check, his "salary" was not paid when he went on vacation, and Plaintiff

Martinez was not compensated for the days he was not at work, beyond his accumulated

Paid Time Off. Similarly, when Plaintiff Martinez did not work his full 40 hours in a

week, he was only paid for the hours he worked, and not some fixed salary amount.

Again, the pay and work records of Quail Run provide all known relevant information.

16)     Because Mr. Martinez was designated as "salaried" on his paycheck, but

never received a salary, Mr. Martinez states that all violations of the requirement that Mr.

Martinez be paid time-and-a-half were willful and knowing, and done because of national

origin discrimination against Mr. Martinez who at the time was one of two Hispanic

"managers" at Quail Run.

WHEREFORE, Plaintiff prays for judgment against the Defendant, for his lost

overtime damages, the additional penalty of twice that amount, interest as allowed by

law, attorney's fees and costs, all in an amount to be determined at trial, plus such other

and further relief as the Court deems just and proper, including all allowed permanent

injunctive relief including rehiring, appointment of a special master, and all other relief allowed by law.

## GENERAL PRAYER FOR RELIEF AS TO ALL COUNTS

**WHEREFORE**, Plaintiff requests that this Court:

a. Award against Defendant, and in favor of Plaintiff Martinez, twice his improperly compensated overtime pay;

b. Award against Defendant, and in favor of Plaintiff, attorney fees and costs;

c. Award against Defendant, and in favor of Plaintiff, interest on the accumulated backpay;

f. Award against Defendants, and in favor of Plaintiff, such other relief as the Court deems to be just and proper in the premises.

Respectfully submitted,

By /S/ George Geran
George Geran, Esq.
Law Office of George Geran
214-A Rabbit Road
Santa Fe, New Mexico 87508
Telephone No.: 505-983-1085
Fax No.: 505-955-1941
Email Address: Geranlaw@aol.com

Attorney for Plaintiff Martinez

FILED 1st JUDICIAL DISTRICT COURT
Santa Fe County
2/17/2022 1:06 PM
KATHLEEN VIGIL CLERK OF THE COURT
Tamara Snee

| SUMMONS | |
|---|---|
| District Court: FIRST JUDICIAL<br>Santa Fe County, New Mexico<br>Court Address:<br>Post Office Box 2268 / 100 S. Catron<br>Santa Fe, New Mexico 87504 / 87501<br>Court Telephone No.: 505-455-8250 | Case Number: **D-101-CV-2021-01888 KMF**<br><br>Assigned Judge:<br>Kathleen McGarry Ellenwood |
| STEVEN MARTINEZ,<br><br>Plaintiff,<br><br>vs.<br><br>QUAIL RUN ASSOCIATION, INC.,<br>And DALE STETSON, former General Manager of Quail Run, individually and In his individual capacity,<br><br>Defendant. | Defendant<br>Name: **Quail Run Association, Inc.**<br><br>Address:<br>3101 Old Pecos Trail, Santa Fe, NM 87505<br><br>39 Ellis Ranch Rd, Santa Fe, NM 87505-1418 |

**TO THE ABOVE NAMED DEFENDANT(S):** Take notice that

1. A lawsuit has been filed against you. A copy of the lawsuit is attached. The Court issued this Summons.
2. You must respond to this lawsuit in writing. You must file your written response with the Court no later than thirty (30) days from the date you are served with this Summons. (The date you are considered served with the Summons is determined by Rule 1-004 NMRA) The Court=s address is listed above.
3. You must file (in person or by mail) your written response with the Court. When you file your response, you must give or mail a copy to the person who signed the lawsuit.
4. If you do not respond in writing, the Court may enter judgment against you as requested in the lawsuit.
5. You are entitled to a jury trial in most types of lawsuits. To ask for a jury trial, you must request one in writing and pay a jury fee.
6. If you need an interpreter, you must ask for one in writing.
7. You may wish to consult a lawyer. You may contact the State Bar of New Mexico for help finding a lawyer at www.nmbar.org; 1-800-876-6657; or 1-505-797-6066.

Dated at Santa Fe, New Mexico, this 10th day of February, 2022.

KATHLEEN VIGIL
CLERK OF DISTRICT COURT

By: ______
Deputy

/s/ George T. Geran
Signature of Attorney for Plaintiff/Pro Se Party

George Geran, Esq.
Law Office of George Geran
214-A Rabbit Road
Santa Fe, New Mexico 87508
Telephone No.: 505-983-1085
Fax No.: 505-955-1941
Email Address: [illegible]

Attorney for Plaintiff Martinez

THIS SUMMONS IS ISSUED PURSUANT TO RULE 1-004 OF THE NEW MEXICO RULES OF CIVIL PROCEDURE FOR DISTRICT COURTS.

**RETURN**

STATE OF NEW MEXICO )
)ss
COUNTY OF SF )

I, being duly sworn, on oath, state that I am over the age of eighteen (18) years and not a party to this lawsuit, and that I served this summons in Santa Fe county on the 16 day of Feb, 2020, by delivering a copy of this summons, with a copy of complaint attached, in the following manner:

**(check one box and fill in appropriate blanks)**

[ ] to the defendant Quail Run Assn. Inc through Mitchell Borrego security guard at gate. *(used when defendant accepts a copy of summons and complaint or refuses to accept the summons and complaint)*

[ ] to the defendant by [mail] [courier service] as provided by Rule 1-004 NMRA *(used when service is by mail or commercial courier service)*.

After attempting to serve the summons and complaint on the defendant by personal service or by mail or commercial courier service, by delivering a copy of this summons, with a copy of complaint attached, in the following manner:

[ ] to ______________________, a person over fifteen (15) years of age and residing at the usual place of abode of defendant ________________, *(used when the defendant is not presently at place of abode)* and by mailing by first class mail to the defendant at ________________ *(insert defendant's last known mailing address)* a copy of the summons and complaint.

[ ] to ______________________, the person apparently in charge at the actual place of business or employment of the defendant and by mailing by first class mail to the defendant at ______________________ *(insert defendant's business address)* and by mailing the summons and complaint by first class mail to the defendant at ________________ *(insert defendant's last known mailing address)*.

[ ] to ______________, an agent authorized to receive service of process f[illegible]