IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STEVEN MARTINEZ,

      Plaintiff,

      vs.                           Civil Action No. 1:22-CV-00185 KG/KK

QUAIL RUN ASSOCIATION, INC., and
DALE STETSON, former General Manager of
Quail Run, individually and in his own capacity,

      Defendants.

## THE PARTIES' STIPULATED ORDER PURSUANT PLAINTIFF'S MOTION TO AMEND HIS COMPLAINT FOR DAMAGES

This matter comes before the Court on "Plaintiff's Motion to Amend His Complaint for Damages, pursuant F.R.C.P. 15, filed April 8, 2022. Subsequent to the filing of the Motion, the Parties agreed that the Form of "Second Amended Complaint for Damages," attached hereto and included herein by reference as Exhibit A may be filed in this matter. The Court, having considered the Motion, which is unopposed, FINDS that the Motion is supported by good grounds and should therefore be GRANTED.

IT IS THEREFORE ORDERED that the form of Complaint, attached as Exhibit A, may be filed in this matter within seven days of the entry of this Order.

_____
UNITED STATES DISTRICT JUDGE

SUBMITTED AND APPROVED BY:


By: */s/ George T. Geran*_____ _____
George Geran, Esq.
LAW OFFICE OF GEORGE GERAN
214-A Rabbit Road
Santa Fe, New Mexico 87508
(505) 983-1085
(505) 995-1941 Facsimile
geranlaw@aol.com
*Attorneys for Plaintiff Steven Martinez*


-AND-

APPROVED BY:


By: */s/ Cassandra R. Malone*_____ _____
Cassandra R. Malone
T.J. Mitchell
JENNINGS HAUG KELEHER MCLEOD LLP
201 3rd Street, NW, Suite 1200
Albuquerque, NM 87102
(505) 346-4646
(505) 346-1370 Facsimile
crm@jhkmlaw.com
tjm@jhkmlaw.com
*Attorneys for Defendant Quail Run Association, Inc.*

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STEVE MARTINEZ,

      Plaintiff,

    vs.                             Civil Action No. 1:22-CV-00185 KG/KK

QUAIL RUN ASSOCIATION, INC., and
DALE STETSON, former General Manager of
Quail Run, individually and in his own capacity,

      Defendants.

## SECOND AMENDED COMPLAINT FOR DAMAGES

    **COMES NOW** Steven Martinez, hereinafter referred to as "Plaintiff", by and through his

attorney of record, George Geran of the Law Office of George Geran and hereby submits the

following as his Second Amended Complaint for Damages:

### JURISDICTION, VENUE AND PARTIES

    1)      At all times material to this complaint, Plaintiff Martinez was a resident of San

Miguel County, State of New Mexico and an employee or former employee of the Defendant

Quail Run Association, Inc, which is in Santa Fe County, New Mexico at 3101 Old Pecos Trail

Santa Fe, NM 87505. Mr. Martinez is a New Mexico native who is of Hispanic descent. All

relevant actions, to the best of Plaintiff's knowledge, took place in Santa Fe County.

    2)      Defendant Quail Run Association, Inc. is a condominium association related to

home-owning and renting, and social and recreational activities provided in the gated

community. The Association's website advertises it is a place for "Exceptional People."

Plaintiff worked there for about 30 months. The Association regularly advertises itself as having

265 condominiums within the community. Plaintiff believes the vast majority of persons

1

(perhaps 95% or more) residing in Quail Run are Anglo, the Board managing the Association's various businesses (all Board Members residing, at least part-time, in Quail Run proper) is wholly Anglo, and the vast majority of the management team is Anglo as well. Defendant Quail Run Association, Inc. employs more than 80 employees in conducting its business or businesses. Defendant Quail Run Association, Inc. is an "employer" pursuant the relevant statutes. Defendant Quail Run Association, Inc. conducts business throughout New Mexico, and the United States.

3)      Defendant Dale Stetson is an individual who was employed by Quail Run throughout Plaintiff Martinez' employment as the General Manager of Quail Run and was Plaintiff Martinez' indirect supervisor throughout that employment. At all times relevant to the Complaint, Defendant Dale Stetson was a resident of Santa Fe County, New Mexico. Shortly after the termination of Plaintiff Martinez, upon information and belief, Defendant Stetson either resigned or was terminated by Defendant Quail Run, related to the mishandling of Plaintiff Martinez' termination and complaints of discrimination. Since that time, he may have moved his residence to Hawaii.

4)      This Court has personal and subject-matter jurisdiction over the parties, and the amount of damages sought herein is in excess of the jurisdictional minimum of this Court. Venue is appropriate herein as well. The original state court complaint, amended once prior to service as of right, was removed to Federal Court by Defendants, and the Plaintiff, now seeks to file this Complaint to include the March 31, 2022 issuance of an Order of Non-Determination by the New Mexico Human Rights Bureau, pursuant Plaintiff's New Mexico Human Rights Act claim, attached hereto as Exhibit One.

**FACTUAL ALLEGATIONS**

2

5)      Defendant Quail Run Association, Inc. manages the Quail Run development at the north edge of the City of Santa Fe's Boundaries, and employs very nearly 100 employees, with only one current Hispanic Manager, immediately following the termination of Mr. Martinez. Because Defendant's workforce has historically had a high percentage of Hispanic workers, racial, national-origin and skin color equity would suggest that the management team should reflect the workforce. At the time of Plaintiff Martinez' termination Defendant had an all-Anglo Board, an Anglo General Manager, an Anglo Business Manager; an Anglo Housekeeping Manager; an Anglo Recreation Manager; an Anglo Food Service Manager; an Anglo Bar and Grill Manager; a Facilities Manager, who Mr. Martinez believes may be Native American; and Mr. Martinez's brother (who is Hispanic like Mr. Martinez) as a Grounds Manager. The racial, national origin, and skin color imbalance in Defendant's management staff creates operational issues because senior management was and is isolated culturally and socially, and sometimes by language, from the concerns of its staff.

6)      Similarly, though Quail Run has many employees, at the time of Mr. Martinez's termination it had no Human Resources Manager, and thus no one in charge of directly and knowledgably supervising the legality of its hiring, termination, promotional, compensation and discipline practices. Regular Human Resources procedures like internally auditing its discipline, hiring, compensation and promotional choices would have provided direct knowledge and updates of its practices to heal the racial/color/national origin divide within its staff.

7)      Mr. Martinez was originally hired as a maintenance or engineering crew member in the Fall of 2018. This was following Mr. Martinez' retirement from long-time State employment, most recently and for the last five years of his 20 year-plus State career, as the Physical Plant Director for the Santa Fe State Prison and Correctional Officer Academy, where

3

he had 20 years doing exactly what he thought one day he would be doing for Quail Run -- but on a much bigger scale.   He supervised 5 Maintenance supervisors of the various physical facilities the Corrections Department operates in Santa Fe County, meaning chiefly all the prisons and offices associated with the prisons.   The total staff under his direct and indirect supervision exceeded 30 employees, and he had full authority to hire, discipline, and direct his staff.

8)      On or about June 5, 2019 – perhaps after six months of working for Quail Run -- he was promoted to Maintenance or Engineering Department Manager, where he ostensibly managed a crew of 10 to 12 workers, a department where typically 4 out of 5 employees are Hispanic. The previous Maintenance Manager was Tim Romero, and Mr. Romero is believed to be of Hispanic descent, and like Plaintiff Martinez was of darker skin color than all other managers at Quail Run except for Mr. Martinez' brother, who again is of darker skin color than all other managers at Quail Run.   Mr. Romero, during his approximately six months as Mr. Martinez' direct supervisor, told Plaintiff Martinez several times that then-Facilities Manager David Pfeiffer did not like Mr. Romero, and that Mr. Pfeiffer would not let him manage his own department.   The actual cause of Mr. Romero's end of employment is unknown to Plaintiff Martinez, as Romero simply did not come to work one day, and then-Facilities Manager Pfeiffer announced that Mr. Romero would not be returning.   Shortly thereafter, Plaintiff Martinez was named as Mr. Romero's replacement, as Plaintiff Martinez' expertise with all jobs and tasks the Department performed, and his ability to manage his employees were long-standing skills of Plaintiff Martinez, following his State career.

9)      A few months before, Mr. Pfeiffer had placed a photo of a monkey with his name "Steve" under it on the computer screen of the digital time clock where all his then co-employees

4

and Plaintiff Martinez would punch in at the same time.  Plaintiff Martinez took a slightly blurry photo of that screen as soon as he saw it and kept it in his phone. The photo's digital properties show he took the photo on April 15, 2019, at 12:02 pm.  Mr. Martinez was still inputting his data into the digital clock -- with his co-employees surrounding him -- when the photo popped up on the screen, and his first notice of the photograph's presence was a burst of laughter from all his co-employees. He questioned his co-employees about the photo, and they told him that Mr. Pfeiffer had created the photo and placed it within the digital program, something his co-employees found humorous for a long time, particularly after Plaintiff Martinez became their supervisor less than two months later.   In retrospect, Plaintiff Martinez realized that Mr. Pfeiffer's admitted action in equating Plaintiff Martinez with a monkey was likely provoked by Mr. Pfeiffer's discomfort with having an Hispanic laborer with similar credentials to his own, as Mr. Pfeiffer had previously been the Santa Fe City Facilities Manager.

10)     Plaintiff Martinez then complained to his direct supervisor, Pfeiffer, about the photo on the screen, and Pfieffer admitted that he placed the photo on top of Plaintiff's ISolved Pay Day HCM (the application Quail Run uses to manage payroll) profile to create the photo, and he began laughing indicating that he thought it was funny and a joke. Plaintiff Martinez told him immediately it was no joke and asked him to please remove it (because only senior management had access to that part of the timekeeping program) however, Pfeiffer never took the photo off Mr. Martinez' input screen. Furthermore, after a day or two of inaction, Plaintiff Martinez also complained about the photo to Mr. Pfieffer's supervisor, Defendant Stetson, the General Manager of Defendant Quail Run.  Stetson told him that he would take care of it, but the photo remained on the screen for another week, so Plaintiff Martinez went back to Defendant Stetson, and complained of the photo again. Nevertheless, both Plaintiff Martinez' direct

supervisor and Quail Run's General Manager kept the monkey photo on Plaintiff Martinez'
digital time keeping screen up and until his last day at Quail Run in May, 2021, more than two
years later.

11)     Mr. Martinez reports that the hiring practices in his former Department (the hiring
was always done by the Facilities Manager -- meaning during Mr. Martinez' employment, Mr.
Pfeiffer or his successor James Lente) are discriminatory as well. Immediately before his
termination, four Hispanic employees of the Maintenance Department were terminated for being
undocumented workers (another Human Resources issue).  Quail Run hired three employees to
replace the four Hispanic workers, (a change that left Plaintiff Martinez with little or no time to
directly supervise any of the work, as Mr. Martinez was a manager in name, but not in job
function).  Two of those employees were Anglo, though Mr. Martinez reports that the applicant
pool for the Maintenance Staff is regularly something like 90% Hispanic.  As well, during
Plaintiff Martinez' conversations with Defendant Stetson and then-Facilities Manager Pfieffer
about the staffing and pay of Martinez' subordinates, Defendant Stetson told him that he favored
computer literate and English-speaking and reading employees (which Plaintiff Martinez
explicitly stated to each manager was irrelevant to the positions the employees would be
working, and began to suspect was discrimination against Hispanics, all immigrants, and persons
with darker skin).

12)     Further, Plaintiff Martinez worked briefly in the position of Facilities Manager as
well as Maintenance Manager several months before his termination for a pretextual reason in
May 2021. In November 2020, then-and long-time Facilities Manager David Pfeiffer resigned.
From the date of former Facilities Manager Pfieffer's resignation until approximately January
2021, Plaintiff Martinez served as the Facilities Manager addressing administrative tasks for

essentially the first time.  Plaintiff Martinez requested additional compensation for the additional work and was offered one week of vacation for some two months of additional responsibilities. Plaintiff Martinez refused and secured $2500 for the additional work.  During the time that Plaintiff Martinez worked as Facilities/Maintenance Manager he worked supervising a full underground garage lighting project (originally budgeted at $50,000) for $10,000, completed recertification of the pool with the Environment Department, oversaw contractors related to a roofing project, and supervised a contractor regarding a mold remediation issue. All work was completed timely and successfully.  Nevertheless, when Plaintiff Martinez applied for the open permanent position he was currently working in on a temporary basis, he was refused the opportunity of an interview and Native American James Lente was hired.  Mr. Lente has less-dark skin then Plaintiff Martinez, and less experience and expertise in facility management than Plaintiff Martinez.

13)     Plaintiff Martinez knows that throughout his time with Defendant Quail Run Association, Inc. he was treated differently because he was one of the few Hispanic managers at Quail Run, and that different treatment resulted in:

a)      lower pay than the other mostly Anglo supervisors;

b)      different, and illegal, standards for determining his pay (see FLSA claim below);

c)      different work standards than were enforced against the Anglo Managers, including specifically being treated differently in the management authority he was given (none) and the tasks he performed (he never worked as, or was truly regarded as, a manager);

d)      routinely having his recommendations and decisions ignored by senior management, as they essentially ran his department for him, despite his on-going and always-demonstrated full competency to do so;

7

e)      Defendants refusal to interview him, despite his long-term demonstrated competency in the field of Facilities Management, for the open Facilities Management position, and Defendants' consequential failure to hire him for the open position, despite working successfully as the Acting Facility Manager, having better experience and training (by information and belief) than the successful outside applicant, Mr. Lente, and despite the fact that both Defendants had previous experience with Plaintiff Martinez, and none with Mr. Lente.

f)      the monkey photo which remained up (and a daily reminder of management's disdain for him) despite three explicit, no-nonsense complaints regarding the matter;

g)      turning a long-time, established manager and supervisor with expertise at Facilities Management, and turned him into a laborer;

h)      in other means and manners.

This habitual different and disrespectful treatment eventually ripened into the Defendants' termination of him on May 21, 2021 for a non-offense no Anglo manager would have even been criticized for. All the above factors contributed to the pervasive and continuously hostile work environment endured by Plaintiff Martinez.

14)      Plaintiff Martinez was eventually terminated because four of his supervisees (not himself, as he was excused from work and was driving his wife to and from her once every two week or so Multiple Sclerosis massage appointment on April 19, 2021) apparently or allegedly staged a walk-out from work to make some unknown point in the worst possible way. Plaintiff Martinez' wife's massage appointments are scheduled on an as-needed basis whenever she begins to have signs of lack of muscle control. This occurs regularly, some one to three weeks after the last massage appointment, but the need for the appointment is determined by his wife's body.  The massages help her M.S. as it gives her nervesstimulus from her skin and muscles (not

her brain), and thus, helps her neural connections to be made successfully.  The process of un-numbing deadened nerves is quite painful for Maria Martinez, and the treatments render her temporarily unable to drive herself home from the appointments. Mrs. Martinez told Plaintiff Martinez that she needed a massage appointment soon on the evening of April 15, the appointment was arranged on April 16, and Plaintiff Martinez secured permission to miss work from Mr. Lente on April 17 to drive his wife to and from the appointment on April 19. This had nothing to do with any walk-out and has been something the Martinezes did regularly throughout his employment by Quail Run.

15)     After he had secured his day off, his supervisees Tim Garcia and Ruben Montoya came to him and told him they were not coming into work Monday.  Plaintiff Martinez heard them and told the two "I don't care" because he was trying to convey the two were speaking nonsense. He obviously did care about the attendance of his staff, but at the time he did not understand the conversation well. He half-thought the two were making a bad joke.  He half-thought if the two did not show up for work on Monday, he would discipline them (or rather try to get Lente and/or Stetson to discipline the two, as Plaintiff Martinez was never allowed to discipline his staff without decision-making input from Lente, Pfeiffer, or Stetson).  That was the end of the conversation, and he now realizes he should have initiated discipline on the spot by going to Lente or Stetson.  He was hoping that Mr. Garcia and Mr. Montoya did not mean what they said, and thought that by actively and directly ignoring them, they would come to their senses. He now realizes that response was an error of judgment, but he honestly expected both men would be at work Monday.  Neither Mr. Garcia nor Mr. Montoya told Plaintiff Martinez the reason for their scheme, nor that they were securing other workers' participation. He flatly denies

any direct or indirect involvement or knowledge of the walk-out, and does not know why the walk-out occurred.

16)      Immediately following the April 19 walk-out of four employees, Defendant Stetson told Plaintiff Martinez that he was not upset about the walk-out and wanted to pay for his crew's lunch. Nevertheless, the matter was investigated, and allegedly found – without any basis in fact – that Plaintiff Martinez had instigated and organized the walk-out. It is clear from the sequence of Quail Run's decision-making process that:

a)      The investigation never developed sufficient facts for Mr. Stetson and the Board to make accurate decisions regarding that April 19 walk-out. The investigation (convened with the event and concluded by April 21) artificially shut down without conclusive evidence, which could have been cured by bringing in other informed voices (not meaning former Facility Manager David Pfeiffer), who had resigned five months before the investigated events);

b)      The investigation is also fatally flawed because Plaintiff Martinez was interviewed first, and never confronted with the totality of the information gathered during the investigation. Doing so would have given him more opportunity to contradict himself, and the ability to comment on any evidence against him. It's also standard investigative procedure to re-interview the target of any investigation as the final act of the investigation;

c)      Mr. Pfeiffer was apparently interviewed by the investigator as well, related to eventshe had no knowledge of because he resigned five months or more before April 19, 2021. In early November 2020, Plaintiff Martinez approached then-Quail Run Facilities Manager Pfeiffer related to information that Mr. Pfeiffer – who is the former Santa Fe City Facilities Manager and who resigned from that previous position after allegations of self-dealing emerged against him within City management. Pfeiffer had his house painted by Quail Run's painting

10

contractor, Extreme Painting, in return for Mr. Pfeiffer's influence over the contracting decision.
Plaintiff Martinez brought the allegation -- madeby an Extreme Painting employee -- to Mr.
Pfeiffer out of loyalty and respect for the chain of command.  Shortly after that conversation
(meaning within the week), Mr. Pfeiffer had resigned his position with Quail Run.  It is unknown
at this point if Quail Run had contemporaneous notice of the free painting, but the inclusion of
non-employee Pfeiffer in the investigative interview pool raises that concern, as well as
confirming Plaintiff Martinez' belief of the retaliatory motivation underlying the investigation;
and

   d)  The investigation also suffered because the investigator was an English-only
speaker,and several of the crew has little to no English-speaking skills.

   With perhaps 80 employees Quail Run needed in-house Human Resources direction, not
outside contract help.

   17)  Plaintiff Martinez was terminated from his employment by Quail Run on or about
May 25, 2021.  At the heart of what happened onApril 19 is Quail Run's ignorance of the
concerns of its Hispanic staff, ignorance of the character of the individual employees involved,
and ignorance of the actual demands of the job Quail Run hired Plaintiff Martinez to perform.
Plaintiff traces this back to the systemic discrimination in place at Defective Quail Run, reflected
in a sight that confronts everyone attending every Board and Management meeting –it is simply a
group of well-off Anglos insisting (without real knowledge or sensitivity) that another authority-
less Hispanic babysit the staff Plaintiff Martinez worked among, rather than giving Plaintiff
Martinez the tools to do a great job.  The following non-exclusive list of factors led Plaintiff
Martinez to conclude discrimination motivated his termination and lost promotion:

   a)  the near pure white permanent residents;

b)      the resulting pure white Board;

c)      the resulting near pure white management team, and the near-universally Hispanic assistants assisting that team;

d)      his nearly all Hispanic work crew, and the Housekeeping Department's nearly all Hispanic work crew, managed by the only other Hispanic Manager at Quail Run when he was there; his brother who similarly manages the grounds Department with an all Hispanic crew.

e)      an atmosphere of corruption at Facilities, which was present before he arrived, and he tried unsuccessfully to oppose and correct;

f)      a procedurally and substantively defective investigative report;

g)      no on-site Human Resources supervision; and

h)      evidence of discrimination pervading Quail Run's hiring, promotion, compensation, and discipline decisions, specifically including his own termination and lost promotion.

i)      the change of management course and many management personnel after his attorney's letters of complaint;

j)      the monkey photo with his name under it being placed on the time clock by his Anglo direct supervisor, and then never removed despite his complaints to both his direct supervisor and his Anglo supervisor, Mr. Stetson; and

k)      in other means and manners.

18)     With regard to Quail Run's retaliation against Plaintiff Martinez for complaints and opposition to Quail Run's discriminatory practices, the following non-exclusive list of factors evidence that retaliation:

12

a)      his complaints about Quail Run's failure to promote him;

b)      his complaints about paying his near-all-Hispanic work crew minimum or close to minimum wage, when many of that crew could command twice as much or more on the open Santa Fe market;

c)      his complaints about the failure to take him and his supposed position seriously;

d)      the acceptance of his attorney's complaints of discrimination -- evidenced by the change of course in management behavior which followed those complaints -- but the failure of Quail Run to re-hire him when his attorney suggested that to them;

e)      the failure of Quail Run to discipline Mr. Montoya or Mr. Garcia, despite the apparent acceptance of his attorney's complaints; and

f)      calling a former Quail Run Facilities Manager (Mr. Pfeiffer) as a witness to an investigation of an incident which occurred after Plaintiff Martinez secured his resignation from Quail Run because Mr. Pfeiffer didnot want Plaintiff Martinez to take his knowledge of Mr. Pfeiffer's free paint job to Mr. Stetson.

19)     Mr. Stetson either resigned or was terminated immediately following Plaintiff Martinez' (through counsel's) complaints of discrimination against Hispanics – and though a Human Resources Director was hired, and neither Mr. Montoya nor Mr. Garcia were promoted (though immediately following Plaintiff Martinez' termination they were moved into his office, the office for the Maintenance Manager) – he was not returned to work. Defendants terminated no employees in the maintenance department other than Plaintiff Martinez related to the walk-out incident, and instead -- again following Plaintiff's complaints about the lack of supervisory time he had when Maintenance Manager -- had hired three new Maintenance workers. Finally, Mr. Lente's assistant – Candy Grimes -- was terminated or resigned from her position shortly

thereafter as well.

20)     When replacing Plaintiff Martinez, Defendants chose Randy Sanchez, a Hispanic, and when replacing Ms. Grimes chose Charmaine Garcia, a Hispanic, as well, following Plaintiff Martinez' and counsel's repeated complaints of race, color and national origin discrimination against Hispanics, persons of darker skin tone, and workers of other than United States' national origin and ancestry.  Mr. Sanchez left work with Defendant Quail Run within weeks of starting. Charmaine Garcia resigned within a few months of starting work with Defendant complaining of discrimination.

21)     Anglos give the orders within Quail Run, and Hispanics carry them out. Hiring Hispanic supervisors within the two departments doing the most physical labor within the organization, then, is a symptom of the universal discrimination Quail Run inflicts upon Hispanic/Latinx employees.  Any Hispanic supervisor, like Plaintiff Martinez, is hired and retained as a supervisor only if they can keep a lid on the effects of the discrimination on their primarily Hispanic employees.  Because of Quail Run's failure to support Plaintiff Martinez' supervisory efforts and complaints of under-paying his crew, Plaintiff Martinez was unable to keep that lid clamped down.  The "walk-out" and his termination, his lost promotion, the monkey photo, and the national origin, color, race and ancestry of his apparent replacement (who quit shortly thereafter) all derive from the same source – the near universal discriminatory treatment Hispanics suffer within Defendant Quail Run as a whole – from residents to Board to supervisors to employees. Instead of fixing the issues at maintenance, Defendant Quail Run perpetuated and intensified them by, first, promoting two of Plaintiff's supervisees who each have demonstrated histories of disloyalty and dishonesty which directly infected Defendant Quail Run's discipline process.  Then after Plaintiff Martinez' attorney complained regarding the dishonesty and

14

disloyalty of the two supervisee, decided to hire a new Hispanic manager for the primarily

Hispanic department.  And finally, by not being able to retain Plaintiff Martinez'

Hispanic/Latinx replacement Randy Sanchez, or re-hiring Plaintiff.

## COUNT I

### Violation of Federal Fair Labor Standards Act for Willful Failure To Pay Overtime to an Employee, 29 U.S.C.S. § 207

22)      Each and every allegation set forth in the preceding paragraphs is incorporated by

reference as if set forth fully herein.

23)      Plaintiff Martinez was an employee of Quail Run Association, Inc. from

November 2018 until May 25, 2021. On or about June 2019 Plaintiff Martinez was promoted to

Maintenance Manager for the large housing complex and supervised a crew of 13 maintenance

workers thereafter. Plaintiff Martinez was directly supervised by Facilities Managers Steve

Pfeiffer (Anglo) originally, and James Lente (Native American), Mr. Pfeiffer's replacement, and

all discretionary decisions were entrusted to the Facilities Manager in that role.

24)      Plaintiff was never paid time-and-a-half overtime wages after his promotion to

Maintenance Manager, and in fact, continued to computer-record his time, just as he did when a

maintenance worker.  The vast majority of Mr. Martinez' job duties and work remained the same

after his promotion to Maintenance Manager.  He did no scheduling, did no ordering, did no

planning, had little to no role in any discipline decisions, did not decide when maintenance work

would be performed, and in fact, did not see the work orders (submitted by residents and others)

until they were given to him the morning the work was to be done. He did not even decide what

crew member would do which assigned task on any day, and this specifically included the work

he himself did.  He did no hiring.  He conducted no job interviews. When Mr. Pfieffer was

Facilities Director, Plaintiff was not allowed to inspect his crew's work to certify completion, but

for the few months when Mr. Lente was Facilities Director, Plaintiff did inspect the work of his crew when it was done and signed off on the completion of the assigned tasks. He did provide an annual performance appraisal for each crew member and believes that task took up one day of work per year.

25)    Ten percent of Plaintiff's time was taken up with administrative tasks, primarily approving days-off requests and approving the time records for each member of his crew every week. He did have an office, but unless the day was highly unusual, he did not spend more than 45 minutes in the office each day. He was compensated at very close to the rate of some of his "supervisees." Instead, he functioned as a Lead Worker for the maintenance crew, working ninety percent of each day performing maintenance tasks alone or with a member or two of his crew, like stuccoing, replacing doors and windows, replacing light fixtures and lightbulbs throughout the facility, moving furniture for residents, installing sky lights, painting porches and decks, repairing and replacing garage doors, and general plumbing work for the Facility as a whole, and for the separate homes within Quail Run. He would also inspect and sign off for work done on the work orders performed by his crew.

26)    Plaintiff Martinez did at times attempt to provide discretionary advice to Facilities Manager Lente and then-Quail Run General Manager Dale Stetson. At times he attempted to secure higher pay for his crew because the largely Hispanic crew was paid less than market rate for the work they did. The lack of pay produced discipline and retention issues. Every time he approached Mr. Lente, Mr. Pfeiffer, and Mr. Stetson; they ignored his requests. Similarly, he expressed opinions to Lente, Pfeiffer and Stetson regarding discipline, and was ignored as well.

27)    Because of the above facts, Plaintiff Martinez was an "employee" pursuant the applicable statutory definition, *see 29 U.S.C.S. § 203 (e) (1)*, and was eligible for none of the

exceptions to the definition of "employee" expressed therein, including *29 U.S.C.S. § 213 (a) (1)*, the executive and administrative exemption, as he worked with his hands on the grounds and in the homes in the Quail Run development, preforming maintenance tasks; did not work in administration;, and had little discretion in any of the decisions of the employer.  Similarly, none of the exceptions to Quail Run being regarded as an "employer," are applicable herein.  *See 29 U.S.C.S. § 203 (d)*.

28)     Throughout his employment as the "Maintenance Manager," Plaintiff Martinez was never paid the requisite overtime rate of time-and-a-half.  Specifically, much of his overtime was caused by snow and ice during the winters, and the resulting problem of providing safe passage along the streets and sidewalks of Quail Run.  At other times, the overtime was due to emergency conditions arising within Quail Run, such as a sewer back-up.  At all times throughout his employment by Quail Run, Plaintiff Martinez was "on-call" status due to the potential of emergency conditions above.

29)     None of Plaintiff Martinez's overtime hours were due to executive or office work.  None of Plaintiff Martinez's overtime work was properly compensated to him, as he was always paid his hourly rate calculated on 40 hours a week (independent of whether he actually worked overtime), unless (when Plaintiff's time total was less than 40 hours per week) he was paid his hourly rate times the amount of hours worked.  Plaintiff Martinez believes he worked 100 to 200 hours of overtime per year throughout his time as the Maintenance Manager.  Plaintiff Martinez believes the Defendant has time records for each and every day of that work. Plaintiff Martinez knows his paycheck fluctuated greatly from period to period, sometimes as much as $500 bi-weekly. Plaintiff Martinez knows that he was paid almost the same hourly rate as many of his "supervisees," who Mr. Martinez had almost no administrative or supervisory responsibility for.

30)     At the same time, and despite Plaintiff Martinez being listed as "salaried" on his paycheck, his "salary" was not paid when he went on vacation, and Plaintiff Martinez was not compensated for the days he was not at work, beyond his accumulated Paid Time Off.  Similarly, and as stated above, when Plaintiff Martinez did not work his full 40 hours in a week, he was only paid for the hours he worked, and not some fixed salary amount. Again, the pay and work records of Quail Run provide all known relevant information.

31)     Because Mr. Martinez was designated as "salaried" on his paycheck, but never received a salary, Mr. Martinez states that all violations of the requirement that Mr. Martinez be paid time-and-a-half were willful and knowing, and done because of national origin discrimination against Mr. Martinez who at the time was one of two Hispanic "managers" at Quail Run.

WHEREFORE, Plaintiff prays for judgment against the Defendant, for his lost overtime and vacation time damages, the additional penalty of twice that amount, interest as allowed by law, attorney's fees, and costs, all in an amount to be determined at trial, plus such other and further relief as the Court deems just and proper, including all allowed permanent injunctive relief including rehiring, appointment of a special master, and all other relief allowed by law.

## COUNT II.

### Violation of the New Mexico Human Rights Act Against Both Defendants

32)     Plaintiff Martinez realleges and incorporates herein as if set forth in full by reference the allegations contained in paragraphs 1 through 31 above.

33)     The New Mexico Human Rights Act (the "NMHRA"), NMSA 1978, §28-1-7 (A) makes it an unlawful and discriminatory practice for an employer to discriminate in the terms and conditions or privileges of employment because of a person's race, color or national origin.

34)     An "employer" pursuant the NMHRA is not limited to present employment or present connection to the plaintiff.  NMSA 1978, §28-1-2 (A)-(B).  Further, it is an unlawful discriminatory practice for any person or employer to coerce, incite or aid the taking of any retaliatory actions against a plaintiff under the NMHRA.  NMSA 1978, §28-1-7 (I).

35)     Defendant Quail Run is both an employer and person covered by the NMHRA.  Individual liability for discriminating and retaliating supervisors like Defendant Stetson is also covered by the NMHRA.  Defendant Quail Run and Defendant Stetson both discriminated and retaliated against Plaintiff during his employment, created a hostile work environment for Plaintiff Martinez, and that environment continued through and motivated Defendants' termination of Plaintiff Martinez.  For purposes of the prima facie discrimination standards, Plaintiff Martinez' treatment by Defendants should be compared to Defendant Quail Run's Anglo managerial and supervisory employees.

36)     Defendants created a hostile work environment in the means and manner alleged above for Plaintiff Martinez and other persons of color through the actions and inactions of the Defendants.  At the same time, the Defendants have actively failed or refused to correct discriminatory and retaliatory behavior by themselves, and members of their staffs. Similarly, upon information and belief, Defendants never disciplined Defendant Stetson for his own acts in fostering a race/color/national origin-discriminatory hostile work environment, nor for his failures to good faith investigate and discipline the actions of Anglo supervisors. Defendant Quail Run discriminated and retaliated against Plaintiff Martinez as a "complaining person of color" up and through his discriminatory termination which involved the use of standards always ignored for Anglo supervisors.

37)     Plaintiff Martinez was subject to a hostile work environment and was discriminated against in connection with the Quail Run's failure or refusal to deal with Plaintiff Martinez's complaints and concerns about his pay, his promotion opportunities, his non-management role, and different hiring, supervision, pay and discipline standards for persons of color, in violation of the NMHRA.

38)     As a direct and proximate result of the actions and inactions of the Defendants, Plaintiff Martinez has suffered and will continue to suffer damages in an amount to be proved at trial, including termination, but not limited to damages for lost wages, humiliation, mental anguish, and emotional distress all in an amount to be proved at trial herein.

39)     Plaintiff Martinez is also entitled to an award of reasonable attorney's fees and costs in connection with his claim of national origin/race/color discrimination and retaliation under the NMHRA.   Plaintiff Martinez filed his New Mexico Human Rights Bureau Charge against the Defendants related to all acts complained-of herein on January 31, 2022, and has completed administrative exhaustion of the claim pursuant the Human Rights Bureau's March 31, 2022 Order of Non-Determination, attached hereto and included herein as Complaint Exhibit One, in addition to a copy of the initial Charge.  Plaintiff hereby gives notice that he may request a mixed-motive instruction at the trial of this matter.

WHEREFORE, Plaintiff Martinez prays for judgment against the Defendants for compensatory damages, interest as allowed by law, and attorney's fees and costs, all in an amount to be determined at trial, plus such other and further relief as the Court deems just and proper.

## **COUNT III**

### **Breach of Contract Against Defendant Quail Run**

20

40) Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 39.

41) Plaintiff was employed by Defendant QUAIL RUN under a written, oral and/or implied contract of employment which was modified and re-enforced by certain policies, practices, assurances, and other express and implied statements of Defendants, including specifically policies in QUAIL RUN's employee handbook describing rights and promises pursuant QUAIL RUN's handling of the complaints and general employment of employees of color. In said contract, it was implicitly agreed that Plaintiff would not be impeded in her job duties, and explicitly agreed that he would be terminated only for just cause. Further said contract stated expressly that Mr. Martinez:

a) would not be discriminated against because of his race, national origin, or color;

b) would have the same opportunities as other employees for pay and advancement, including salaried vacation time;

c) would not be retaliated against for complaining of the discrimination against himself, or his employees

d) would not be ridiculed publicly because of his race/national origin/color; and

e) in other means and manners.

Plaintiff entered into said contract, *inter alia*, to secure peace of mind and financial stability, and refrained from seeking employment elsewhere in reliance thereon.

42) At all times material hereto, Plaintiff performed his obligations under his contract with Defendant Quail Run. Defendant breached its express, implied, and promissory estoppel contractual commitments to Plaintiff by terminating his employment without proper cause, by

21

repeatedly violating the law in handling his pay, and by terminating him for a fictional reason as described above.

43) At the time the parties entered into the contract, as alleged herein above, it was known and understood, and within the reasonable contemplation of the parties, that in the event of a breach, Plaintiff would suffer present and future loss of earnings as a foreseeable and probable result thereof. Further it was known and understood, and within the reasonable contemplation of the parties, that in the event of a breach, Plaintiff would suffer present and future emotional distress as a foreseeable and probable result thereof.

44) As a direct and proximate result of Defendants' knowing and intentional breach of the contract, Plaintiff in fact has suffered loss of wages and benefits, the full extent and nature of which are presently unknown to him. Plaintiff will therefore seek leave of Court to amend this complaint at such time as these damages are fully ascertained. Plaintiff claims punitive damages based on the intentional nature of these violations

## COUNT IV

### Wrongful Termination in Violation of Public Policy And Retaliatory Discharge Against Both Defendants

45) Plaintiff repeats and realleges by reference each and every allegation contained in the paragraphs above and incorporate the same herein as though fully set forth.

46) Plaintiff was ridiculed in the performance of his job duties, lost an earned promotion, was paid pursuant different, illegal standards, and had his regular job of Quail Run Maintenance taken from him, was terminated without cause, and subjected to discrimination, when he repeatedly pursued his rights to a discrimination-free workplace for himself and his employees. The actions of Defendants represent retaliation for pursuing his legal rights, as well as retaliation for complaining of discrimination at Quail Run against his Hispanic crew members,

and fraudulent behavior by other employees.  Plaintiff's complaints were made for the purpose

of protecting himself and his workers from on-going discrimination and fraudulent practices of

Defendants, and retaliation for his on-going and regular complaints on behalf of himself and his

crew were motivating factors in his termination.  Defendants have offered other reasons for such

discipline actions, harassment, and the denial of promotion related to Mr. Martinez' complaints.

All such other reasons for the negative employment actions are pretext.

47)     It is the public policy of the State of New Mexico as expressed in the New

Mexico Human Rights Act, N.M.S.A. 1978, §28-1-1 *et. seq*, that an employer may not

discriminate in the terms and conditions or privileges of employment because of a person's

race/national origin/color or to retaliate for complaining of such discrimination, and in the

common law that individuals shall not be retaliated against and discriminated against in their

employment on the basis of their complaints of discrimination and harassment of themselves and

others, nor on the basis of hiring a lawyer to secure his legal rights.

48)     The actions, as well as the inactions, of the Defendants comprised a breach of the

defendants' duty to provide a safe work environment to Plaintiff free from breaches of contract,

discrimination, and retaliation.

49)     The actions and inactions of Defendants had the effect of causing and worsening

the alleged conduct, as the supervisory and policy-making employees of the Defendants knew

and consciously disregarded the risk of discrimination, retaliation, and termination of Plaintiff

Martinez by the Defendants, and thus had the effect of encouraging the involved conduct.

Despite the knowledge of this risk, the supervisory and policy-making supervisors took no

corrective action, and failed to institute procedures, disciplinary action, or training to eliminate

the risk of the behavior alleged herein. Specifically, Defendant knew or should have known that

Defendant Stetson would terminate plaintiff Martinez without cause, deprive him of the benefits

of his contract, and retaliate against Plaintiff Martinez, and failed to act to replace, train, or

adequately supervise Defendant Stetson.

50)     Defendants negligently failed to operate and maintain employment conditions so

that the following dangerous conditions were created by their negligence towards Plaintiff

Martinez and Quail Run's other employees:

a)      discrimination against employees because of their race/national origin/color,

b)      retaliatory terminations without just cause against employees who complained of

discrimination, or because they hired a lawyer to secure their legal rights;

c)      ensuring that contracts and quasi-contractual arrangements were honored; and

d)      by other failures to operate and maintain office premises in means and manners

that will be more specifically identified later.

51)     Defendant Quail Run's retention of the individual supervisor Stetson, and its

failure to act to train, investigate, and supervise him appropriately and non-negligently

affirmatively and proximately caused Plaintiff financial and emotional injury.

52)     Defendant Quail Run's wrongful retention of the individual supervisors, failure to

ensure that Defendant operated pursuant its own policies and procedures, lack of effective

supervision and procedures, lack of a complete investigation, and failure to secure all evidence

amounted to a complete failure to address and prevent the conduct of Defendants and constituted

a custom, pattern, practice and policy of negligence regarding the welfare of Plaintiff and other

employees of color and/or complaining employees.

53)     As a direct and proximate result of Defendants' actions, Plaintiff has suffered and

will continue to endure pain and suffering, economic injury and mental anguish and emotional

distress; he has incurred and will incur medical expenses in the future for treatment by psychotherapists and other health professionals, and for other incidental expenses; and he will and has suffered a loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial. Further Defendants' actions were knowing and intentional and taken with specific discriminatory and retaliatory intent. Therefore, the Plaintiff is entitled to punitive damages in an amount to be proven at trial.  This cause of action is pled in the alternative to Count III, Breach of Contract.

**GENERAL PRAYER FOR RELIEF AS TO ALL COUNTS**

**WHEREFORE**, Plaintiff requests that this Court:

a.  Adjudge and decree that Defendants violated the Plaintiff's civil rights, and acted in a manner to harm Plaintiff, and have done so willfully and intentionally;

b.  Award against Defendants, and in favor of Plaintiff, compensatory damages sufficient to compensate Plaintiffs for his humiliation, suffering and other injuries that Defendant's wrongful actions has caused, specifically including:

   i)   backpay, specifically including double lost overtime pay pursuant the FLSA claim;

   ii)  loss of fringe benefits, including paid vacation;

   iii) loss of future earnings and future lost benefits, like loss of pension benefits;

   iv)  emotional distress damages;

   v)   medical and psychological expenses;

   vi)  future medical and psychological expenses;

vii)     loss of household services;

viii)    loss of enjoyment of life;

ix)      reputational damage, specifically including, but not limited to, damage to job-securing abilities wrought by discriminatory termination; and

x)       any other damages which this Court deems fit and proper.

c.  Award against Defendants, and in favor of Plaintiff, compensatory damages sufficient to compensate Plaintiff for the bad faith and discriminatory actions of Defendant, including compensation for lost past and future income, lost benefits, and job opportunities, together with interest thereon, in an amount to be determined;

d. Award against Defendants, and in favor of Plaintiffs, punitive damages sufficient to punish Defendants and to deter Defendants from such willful, reckless, and fraudulent actions;

e. Award against Defendants, and in favor of Plaintiff, attorney fees and costs;

f.  Award against Defendants, and in favor of Plaintiff, such other relief as the Court deems to be just and proper in the premises.

All told, Plaintiff's damages should exceed $300,000.

Respectfully submitted,

By_____/S/ George Geran_____
George Geran, Esq.
Law Office of George Geran
214-A Rabbit Road
Santa Fe, New Mexico 87508
Telephone No.: 505-983-1085
Fax No.:  505-955-1941
Email Address: Geranlaw@aol.com

Attorney for Plaintiff Martinez

# Exhibit One



HRB # 22-01-0032-S

Department of Workforce Solutions                    HRB-9j
Human Rights Bureau                                  Page 1 of 2
1596 Pacheco Street, Suite 103, Santa Fe, NM 87505
Phone: (505) 827-6838   Fax: (505) 827-6878

| NMAC 9.1.1.8(I) | **Order of Non-Determination** |

March 31, 2022

George Geran
Law Offices of George Geran
214-A Rabbit Road
Santa Fe, NM 87508

**Re:**   **Steve Martinez vs. Quail Run Association, Inc./Dale Stetson**

Dear Mr. Martinez:

As authorized by Section 28-1-10 (D) of the New Mexico Human Rights Act, this letter
constitutes an **Order of Non-Determination** as to your Charge. Section 28-1-10 (D) of the Act
permits any person who has filed a timely Charge with the Human Rights Bureau to request an
Order of Non-Determination. Section 28-1-10 (D) also requires that the Director of the Bureau
issue an Order of Non-Determination when a proper request for the Order is made.

By issuing this Order of Non-Determination, the Bureau has closed this Charge administratively,
*with prejudice*. Therefore, you may not file this complaint again with this Bureau. You may
obtain a new trial however, by appealing this Order of Non-Determination to the proper district
court. According to Section 28-1-13 (A) of the New Mexico Human Rights Act, **you have
ninety (90) days** from the date of service of this Order of Non-Determination to file notice of
appeal in the district court of the county where the alleged discriminatory practice occurred or
where the respondent does business.

The Bureau should not be named as a party to the appeal, unless you have an independent and
separate claim against the Bureau. Section 28-1-13 (A) of the Act also requires that you serve a
copy of the notice of appeal personally or by certified mail, return receipt requested, at the last
known address of all parties. You also must serve a copy of the notice of appeal on the Bureau
office in Santa Fe. To properly serve the parties, you must comply with any other service of
process requirements set forth in the New Mexico Rules of Civil Procedure at 1-004.

HRB # 22-01-0032-S



Department of Workforce Solutions
Human Rights Bureau
1596 Pacheco Street, Suite 103, Santa Fe, NM 87505
Phone: (505) 827-6838   Fax: (505) 827-6878

HRB-9j
Page 2 of 2

**If you do not timely file a notice of appeal with the appropriate district court, and if you do not properly serve the notice, your right to appeal this order of non-determination to the district court will expire.**

If you have any question concerning this Order, contact the Human Rights Bureau.

Kimberly Souders
Acting Labor Relations Director

cc: Cassandra Malone
    Jennings Haug Keleher McLeod LLP
    201 Third Street NW, Ste.1200
    Albuquerque, NM 87102



HRB #22-01-0032-S

State of New Mexico
Department of Workforce Solutions                    HRB-3e
Human Rights Bureau                                  Page 1 of 1

| NMAC 9.1.1.8(G) | **Investigation Notice to Claimant** |
| --- | --- |

March 18, 2022

George Geran, Esq., Attorney
Law Office of George Geran
214-A Rabbit Road
Santa Fe, NM 87508
geranlaw@aol.com

**Re:    Steve Martinez v. Quail Run Association, Inc.**

Dear Steve Martinez:

This case was not selected for mediation or attempts to mediate this case were unsuccessful. Because this complaint falls within Human Rights Bureau (HRB) jurisdiction, the HRB will conduct a non-biased investigation pursuant to the requirements of the Human Rights Act of New Mexico, NMSA 1978 §28-1-10.

We will contact you as the investigation proceeds and when we need more information from you about your case. **It is your responsibility to keep a current address and phone number on file with this office**. If we are unable to contact you for thirty (30) days at your last known address or forwarding address, this agency will dismiss the complaint without prejudice and administratively close your file pursuant to regulation 9.1.1.8(H)(2) of the New Mexico Administrative Code.

If you have any questions about this process, please contact me at (505) 629-2984 or Brendan.Miller@state.nm.us.

Sincerely,

*Brendan Miller*

Brendan Miller
Civil Rights Investigator

Enclosures:    Charge of Discrimination





RECEIVED
31
Human Rights Bureau

## HUMAN RIGHTS BUREAU DISCRIMINATION COMPLAINT

If you believe you have been subjected to discrimination in violation of the New Mexico Human Rights Act, you should complete this form and return it to the New Mexico Human Rights Bureau, 1596 Pacheco Street, Suite 103, Santa Fe NM 87505 within 300 days of the alleged discrimination. Upon receipt, a copy of a complaint alleging discrimination will be furnished to the person against whom the complaint is made and an investigation will be conducted. If a determination is made that the complaint lacks probable cause, the Human Rights Bureau will dismiss the complaint and notify the parties of the dismissal. The complaint shall be dismissed subject to appeal as in the case of other orders of the Human Right Commission. If the Human Rights Bureau determines that probable cause exists to support this complaint, it will attempt to achieve a satisfactory adjustment of the complaint through persuasion and conciliation. If reconciliation fails or appears unlikely to be successful, in the opinion of the Human Rights Bureau, the Human Rights Commission will schedule the matter for a hearing. If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "n/a" on the space provided. Please Print.

HRB 22-01-0032-S

1. Personal Information.

Last Name: Martinez          First Name: Steve          MI: David

Street or Mailing Address: HC 31 Box 14 F

City: Las Vegas     County: San Miguel     State: NM     Zip: 87701

Phone Numbers: Home: (_____)     Work: (_____)     Cell: (505_)426-4159

Email Address: m.martinez575@yahoo.com

Date of Birth: 12/05/1968     Sex: Male: [✓] Female: [ ] Other: _____

2. Person Who You Allege Discriminated Against You

Last Name: Stetson          First Name: Dale          MI:

Street or Mailing Address: Unknown

City: Santa Fe     County: Santa Fe     State: NM     Zip:

Phone Numbers: Home: (_____)Unknown     Work: (_____)     Cell: (_____)

Email Address:



3. Organization Allegedly Involved in Discrimination

Name: Quail Run Association, Inc.

Street or Mailing Address: 1301 Old Pecos Trail

City: Santa Fe          County: Santa Fe          State: NM     Zip: 87505

Phone Numbers: Home: ( 505 )986-2200     Work: (     )          Cell: (     )

Email Address:

Type of Business: Gated Community

Number of Employees: 70

4. What are the issues(s) involved in your claim of discrimination? *Check all that apply*

Employment [✓]   Housing [ ]   Credit [ ]   Public Accommodation [ ]

5. What is the reason (basis) for your claim of discrimination? *For example, if you feel that you were treated worse than someone else because of race, you should check the space next to "Race." If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply.*

Race [✓]   Age [ ]   Sex [ ]   Religion [ ]   Color [ ]   National Origin [✓]   Ancestry [ ]

Physical or Mental Disability [ ]   Serious Medical Condition [ ]   Retaliation [ ]   Gender Identity [✓]

Sexual Orientation [ ]   Spousal Affiliation [ ]

Do you suffer from an urgent medical condition?   Yes [ ]   No [✓]



6. What happened to you that you believe was discriminatory? *Please describe in detail what happened that you believe was discriminatory. Please attach any pages that you may need and copies of any documents or photographs that you believe are relevant to your complaint.*

STATEMENT OF DISCRIMINATORY AND RETALIATORY EVENTS

I, Steve Martinez, being first duly sworn upon my oath affirm and hereby state:

I am 55 years of age and my gender is male.  I reside at HC 31, Box 14-F, Las Vegas, NM 87701. My telephone number is (505) 426-4159.

1) My complaint is against Quail Run Association Inc. (hereinafter "Quail Run,") which employed me from September 11, 2006 until May 17, 2020 always in New Mexico. Quail Run Association Inc. is officed at 1301 Old Pecos Trail in Santa Fe, New Mexico  87505.  My complaint is also against Dale Stetson, the former General Manager of Quail Run Association, Inc. who was my ultimate supervisor with Quail Run throughout my period as first an Maintenance Engineer II and then the Maintenance Manager for the Association (November 5, 2018 through May 21, 2021).  My promotion to Maintenance Manager in the Spring of 2019.  I believe that throughout my time with Quail Run Association, Inc. that was I treated differently because I was one of the few Hispanic managers at Quail Run, and that that different treatment resulted in lower pay than the other mostly Anglo supervisors, different work standards than were enforced against the Hispanic Managers, including specifically being treated differently in the management authority and tasks I performed (I believe I was effectively never regarded as a manager), paid according to different practice than the Anglo supervisors, and routinely had my recommendations ignored by senior management, as they essentially ran my Department for me, and turned me into a laborer.  This habitual different and disrespectful treatment eventually ripened into my May 21, 2021 termination for a non-offense no Anglo manager would have even been criticized for.  I would also state that this habitual different and disrespectful treatment had nothing to do with my experience or knowledge of all required maintenance and supervision issues.  My Resume is attached hereto as Exhibit A, and it shows my extended experience as a Maintenance Director for the New Mexico Corrections Department, where I had 20 years doing exactly what I thought I would be doing for Quail Run, but on a much bigger scale.  I supervised 20 Maintenance Managers of the various physical facilities the Corrections Department operates, meaning chiefly all the prisons.  The total staff under my direct and indirect supervision exceeded 50 employees, and I had full authority to hire, discipline, and direct my staff.

2) I have had an opportunity to review and correct this Affidavit, and it represents my true and correct testimony.


[STATEMENT CONTINUED AFTER THE END OF THE CHARGE FORM PROPER AND ATTACHED]

WORKFORCE
SOLUTIONS

7  Please identify the provision(s) of the law or regulations upon which you base your claim.  *Please list all that you believe apply*

New Mexico Human Rights Act and common law claims

8  When did the alleged discrimination begin?  Upon my hire -- November 5, 2018

Is the alleged discrimination continuing?  Yes: ☐  No: ☑

If the alleged discrimination is not continuing, when did it end?  Upon my termination -- May 17, 2021

9  Have you filed a charge in this matter with Equal Employment Opportunity Commission (EEOC)?

Yes: ☐  No: ☑

Please be sure you have answered all questions as completely as possible, and attach additional pages if there is more than one individual or more than one organization involved in the alleged discrimination or if additional pages are needed to complete your response(s).

I want this charge filed with both the Human Right Bureau and the EEOC. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

_StD Alat_                                    _1 — 13 — 22_

Signature                                      Date

## STATEMENT OF DISCRIMINATORY AND RETALIATORY EVENTS

[CONTINUED FROM CHARGE FORM AND ATTACHED TO CHARGE FORM]

3)      First, related to the different treatment I experienced from the other managers, I was repeatedly and universally told by the Facilities Manager, the General Manager and Human Resources that I was an exempt or salaried employee. Indeed, it says that on my past pay-check document that my "Pay Type" was "Salary." Nevertheless, I essentially worked a manual job requiring little to no discretion or independent judgment, other than determine what workers went where throughout the day, while I, primarily, accomplished manual labor along-side my crew. I picked up the maintenance requests (my crew's assignments), got my crew and/or myself to fix the issue, and contacted Facilities Director James Lente for decision or guidance when any issue arose. Consequently I was ineligible for the "administrative exception" to the Fair Labor Standards Act ("FLSA"), and should have been paid my overtime, time-and-a-half wages, throughout my employment. Quail Run's work documentation and pay records will provide the best evidence of the amount and fact of the underpayment, but I believe I was not paid overtime wages for approximately 150 to 200 hours a year, and did punch in and out for the hours I worked (so Quail Run's time records should provide substantial documentation of the amounts now due me). I estimate the change resulted in a total underpayment of perhaps $15,000 total over my term as supervisor. Quail Run's Employee Manual explicitly attempts to immunize such behavior on Quail Run's part, which many may regard as evidence of the knowing nature of Quail Run's overtime avoidance, as well as warranting review of all employees' pay. My unpaid overtime work occurred often during the winter when snow and freezing kept my crew and myself busy, sometimes providing emergency services to the residents in violation of 29 C.F.R. § 541.200:

§ 541.200 General rule for administrative employees.

[PUBLISHER'S NOTE: Paragraph (a)(1) was revised at 84 FR 51230, 51306, Sept. 27, 2019, effective Jan. 1, 2020. For the convenience of the user, paragraph (a)(1) has been set out twice below. The first version is effective until Jan. 1, 2020. The second version is effective Jan. 1, 2020.]

(a) The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:

(1) [Effective Jan. 1, 2020.] Compensated on a salary or fee basis pursuant to § 541.600 at a rate of not less than $684 per week (or $455 per week if employed in the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, or the U.S. Virgin Islands by employers other than the Federal government, or $380 per week if employed in American Samoa by employers other than the Federal government), exclusive of board, lodging or other facilities:

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

**(3)** Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.

4)    As the Maintenance Manager, myself and my crew worked regularly both inside and outside the homes of the Quail Run residences. Sometimes we would move furniture for residents, or set up or install appliances, or do minor plumbing repairs, or other work that would rightfully be termed household services. Also significant, here, is the fact that employees "providing household services in private homes" are always covered by FLSA and required to be paid time-and-a-half for overtime:

> Other courts that have considered the question of whether employees of a third party service who perform household services in private homes are covered by the FLSA under § 207(l) have held that the FLSA directly covers such employees, and that such employees are subject to FLSA protection. *Arenas v. Truseif Endeavor Corp.*, 2013 U.S. Dist. LEXIS 9376, 2013 WL 271676, at *3 (N.D. Ill. Jan. 23, 2013); *Peterson v. Snodgrass*, 683 F. Supp. 2d 1107, 1121 (D. Ore. 2010); *Hanley v. Hand'N Heart, L.L.C.*, 2007 U.S. Dist. LEXIS 5027, 2007 WL 201088, at *5 (E.D. Va. Jan. 22, 2007) (finding that after the 1974 amendments to the FLSA, "coverage for domestic service employees was therefore driven by the nature of the service provided by the employees, rather than the scope of their employer's economic activity"); *Nellis v. G.R. Herberger Revocable Tr.*, 360 F. Supp. 2d 1033, 1036, 1044 (D. Ariz. 2005).

> *Murphy v. AllStaff Homecare, LLC*, Civil Action No. 16-cv-2370-WJM-MEH, 2019 U.S. Dist. LEXIS 163112, at *10-11 (D. Colo. Sep. 24, 2019).

5)    The FLSA damages provisions provide for double back-pay, and possible reinstatement as well:

> **(b) Damages; right of action; attorney's fees and costs; termination of right of action,** Any employer who violates the provisions of section 6 or section 7 of this Act [29 USCS § 206 or 207] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Any employer who violates the provisions of section 15(a)(3) of this Act [29 USCS § 215(a)(3)] shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 15(a)(3) [29 USCS § 215(a)(3)], including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages. Any employer who violates section 3(m)(2)(B) [29 USCS § 203(m)(2)(B)] shall be liable to the employee or employees affected in the amount of the sum of any tip credit taken by the employer and all such tips unlawfully kept by the employer, and in an additional equal amount as liquidated

damages. An action to recover the liability prescribed in the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action. The right provided by this subsection to bring an action by or on behalf of any employee, and the right of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the Secretary of Labor in an action under section 17 [29 USCS § 217] in which (1) restraint is sought of any further delay in the payment of unpaid minimum wages, or the amount of unpaid overtime compensation, as the case may be, owing to such employee under section 6 or section 7 of this Act [29 USCS § 206 or 207] by an employer liable therefor under the provisions of this subsection or (2) legal or equitable relief is sought as a result of alleged violations of section 15(a)(3) [29 USCS § 215(a)(3)].

29 U.S.C.S. § 216 (underline added).

6)      And yet, different than the other managers and different than Quail Run's Policy Manual mandates, I did not receive a regular bi-weekly salary when I took more than two weeks and three days of time off in a calendar year. Rather than being paid a fulltime salary, my pay fluctuated from week-to-week, sometimes greatly (at least as much as $500 per pay check). Thus, while I was told I was paid a salary, I was only paid salary when it suited Quail Run -- like when I worked more than 40 hours per week, and rather than being compensated during my vacations and sick days. I was regularly charged for the time off. Again, my time and pay records, as well as the pay records of my comparator Anglo managers, are maintained by Quail Run, and are the primary source of evidence related to this claim, though I have records that may capture my lost salary due to lost vacation time herein, derived from Quail Run's failure to provide me my $66,000 of annual salary for the two-and-a-half years I was a supervisor.

7)      I also believe my termination was neither in good faith, and was discriminatory and retaliatory -- following a 5-2 vote of the all-Anglo Board of Directors, allegedly resulted in my termination. The Board is all-Anglo because the permanent residences, and there appear to be nearly 300 of those, are universally or near-universally owned by Anglos. There are simply too many problems with the termination, despite the investigation and vote by the all-Anglo Board with another Anglo, then General Manager Dale Stetson, coaching the Board through the vote, for me not to believe that discrimination and retaliation are the real reasons. Consider the below a partial list:

A)      First, Quail Run has very nearly 100 employees, and had only one Hispanic Manager, immediately following my termination. Because Quail Run's workforce has a high percentage of Hispanic workers, perhaps 50% overall, racial and national-origin equity would suggest that the

management team should reflect that workforce. Immediately following my termination Quail Run had an all-Anglo Board, an Anglo General Manager, an Anglo Business Manager, an Anglo Housekeeping Manager; an Anglo Recreation Manager; an Anglo Food Service Manager; an Anglo Bar and Grill Manager; Mr. Lente, the Facilities Manager, who I believe may be Native American; and my brother (who is Hispanic like I) as a Grounds Manager. The racial and national origin imbalance in Quail Run's management staff creates operational issues because senior management is isolated culturally and socially as well as often, by language, from the concerns of its staff.

B)    Similarly, though Quail Run has considerable staff, it has no Human Resources Manager, and thus no one in charge of directly and knowledgably supervising the legality of its hiring, terminations, pay, promotion, and discipline practices. Regular Human Resources procedures like internally auditing your discipline, hiring and promotional choices would have provided direct knowledge and updates of Quail Run's practices to heal the racial/national-origin divide within its staff.

C)    The hiring practices in my former Department (the hiring was always done by the Facilities Manager, not me) are likely discriminatory as well. A few months before my termination four Hispanic employees of the Maintenance Department were terminated for being undocumented workers (another Human Resources issue). Three employees have been hired to replace the four Hispanic workers. Two of those employees were Anglo, though the applicant pool for the Maintenance Staff is regularly something like 90% Hispanic. I believe that even Quail Run's hiring records evidence disproportionate hiring of Anglo non-supervisors (compared to the number of Hispanic applicants), and correlate with the racial/national origin imbalance in your management team. I am somewhat hampered in describing these practices fully because I was excluded from hiring altogether, something I think a department manager should always have, and a responsibility I had regularly and for years handled in my Facilities job with the State.

D)    Similarly, an incident of recent non-discipline shows that your discipline processes directly favor Anglo employees. Little Snow Johnson, an Anglo, came to me a few weeks before my termination, and told me to fire him because he wanted to kill himself and he had a gun in his car. I reported this to General Manager Stetson and wanted to call the Police because Mr. Johnson had established that he was a danger to himself and others. Nevertheless, Mr. Stetson without consulting with me located the gun, but did not call the Police, thus potentially endangering Mr. Johnson, and perhaps the rest of the crew. Thankfully it turned out well for Mr. Johnson, and he is back at work, without a psychiatric hold on his record, and completely undisciplined despite the enormous work distraction he caused. A written warning would have amply documented the circumstances, and state in no uncertain terms that Quail Run needs Mr. Johnson to seek counselling immediately, and avoid future incidents. Mr. Stetson's performance during the incident was undisciplined as well, despite the enormous risks to the business (staff and residents) Mr. Stetson took. But both Mr. Stetson and Mr. Johnson are Anglo.

E)    I was terminated because four of my supervisees (not myself, as I was excused from work and was driving my wife to and from her once every two week or so Multiple Sclerosis massage appointment on April 19, 2021 apparently or allegedly staged a walk-out from work to make

some unknown point in the worst possible way. My wife's massage appointments are scheduled on an as-needed basis whenever she begins to have signs of lack of muscle control. This occurs regularly, some one to three weeks after the last massage appointment, but the need for the appointment is determined by my wife's body. The massages help her M.S. as it gives her nerves stimulus from her skin and muscles (not her brain) and thus, help her neural connections to be made successfully. The process of un-numbing deadened nerves is quite painful for Maria, and the treatments render her temporarily unable to drive herself home from the appointments. I was told by Maria that she needed a massage appointment soon on the evening of April 15, the appointment was arranged on April 16, and I secured permission to miss work from Mr. Lente on April 17 to drive my wife to and from the appointment on April 19. This had nothing to do with any walk-out, and has been the something my wife and I did regularly throughout my employment by Quail Run. The attached documentation from "Excellent Massage" establishes the truth of my absence on April 19. *Exhibit B.*

F)    After I had secured the day off, my supposed supervisees Tim Garcia and Ruben Montoya came to me and told me they were not coming into work Monday. I heard them, and said "I don't care" because I was trying to convey the two were speaking nonsense. I obviously did care about the attendance of my former crew, but at the time I did not understand the conversation well. I half-thought the two were making a bad joke. I half-thought if the two did not show up for work on Monday, I would discipline them. And I half-thought the last thing I needed was two workers that dealt with their jobs like a game. That was the end of the conversation, and I now realize I should have initiated discipline on the spot. I was hoping that Mr. Garcia and Mr. Montoya did not mean what they said, and thought that by actively and directly ignoring them they would come to their senses. I now realize that response was an error of judgment, but I honestly expected both men would be at work Monday. Neither Mr. Garcia nor Mr. Montoya told me the reason for their scheme, nor that they were securing other workers' participation. I still find it difficult to believe my termination was the result.

G)    My two supervisees, Tim Garcia and Ruben Montoya, apparently stated during the investigation that I told them to stay out of work, and told them to tell other employees to stay out of work. I flatly deny any direct or indirect involvement or knowledge of the walk-out, and do not know why the walk-out occurred. It strains credulity that anyone would think – with an ill wife – that I would order such a thing. How many of my supervisees stated that I told anyone to stay home? If it's only Mr. Garcia and Mr. Montoya who stated that, well, doesn't that strike you as the oldest excuse in the book – the Boss told me to?

H)    And if I really did go temporarily insane and want to damage my family's financial status (during a pandemic) and its crucial access to medical care, why on Earth wouldn't I go all the way, and tell all four employees to stay out directly, and not just Tim Garcia and Ruben Montoya (as, apparently, the two claim)? The only reasonable explanation for what happened here (and I regard the walk-out with no stated purpose as pointless already) is that Tim Garcia and Ruben Montoya arranged the walk-out, and then blamed me because I was their manager and the only tangentially-involved character with any authority to tell them what to do.

I)    I was very aware of the responsibilities of my management position at Quail Run, and was always glad to work there. Mr. Stetson hired me into the position three years ago. I do think the

5

maintenance staff is underpaid. given the amount of revenue that staff justifies for Quail Run through the process of charging all residents maintenance fees (of $1600 to $3000 a month) and the regular pay rates construction workers in the local area command. My Department was actually a profit-center for Quail Run resulting in Quail Run's Reserve Fund. My concern was not a matter of generosity to its employees. but a legitimate management concern with its own racial/national origin/color discrimination overtones. The longer-term employees of the Maintenance Department resent Quail Run's take from their activities when compared to their pay. This issue became larger when I order the Maintenance Crew to complete construction tasks. like roofing. replacing doors and windows. and larger scale repairs on the residences. Grumbling from the crew was the typical response to such orders. and I speculate that the cause of the absence of the four employees on April 19 – is an attempt by Mr. Garcia and Mr. Montoya to protest Quail Run profiting from their skills. but refusing to pay them their fair share of that profit.

J)      At the same time. I tried to talk to Quail Run about this issue several times since becoming employed. I remember. in particular. talking to Mr. Stetson and former Facilities Manager Anglo David Pfeiffer about more pay for a very skilled Hispanic roofer. I remember Mr. Stetson saying "we can't pay him more money because he doesn't read or write [English]." English literacy is beside the point. and the statement appears unconsciously racist as well. The tension in the maintenance crew emanates from Quail Run's insistence that it can hire a maintenance crew to do construction tasks. and pay the crew at about the rate of the current minimum wage. My concern was that Quail Run put me in an unsupportable position with my crew that would have eased if I had been allowed to pay slightly more for the construction work. or give small raises to show management concern. But Mr. Stetson did not trust me there either. and essentially created an unmanageable condition for any Maintenance Manager because all I could do when the crew griped and grumbled is tell them to stop talking and go back to work. That tension. and my failure to secure some concession for the crew from Mr. Stetson may have been what prompted Mr. Garcia's and Mr. Montoya's improper behavior on April 19 – they were tired of being ignored and under-paid for the tasks they do. and acted out like children. And like children. they have blamed me for their own actions.

K)      As support for the above. I had recently learned that Mr. Garcia has been acting on his anger at Quail Run over at least the last several months by using his contact with Quail Run residents to secure additional paid work for his own business. Tag Plumbing. Mr. Garcia has the residents write checks to his son. Cody Garcia. who is still in high school. I have also learned that Mr. Montoya has done the same thing though in a less elaborate way. simply accepting cash in return for working without a receipt. I have never seen either man at Quail Run when not working. so I had begun to speculate that the two were performing the additional work while on Quail Run time. Corroboration for at least part of these activities could be secured very easily by requiring Mr. Garcia to bring in Cody Garcia's bank statements for the six months immediately prior to my termination. and asking Mr. Garcia to explain any larger deposits. What Quail Run would discover then is that residents are paying large sums to Mr. Garcia's son without any other reasonable explanation. And Quail Run could question the involved residents about the payments if there remained any doubt. Additionally. I am currently hampered in full disclosure because I do not remember the names of the residents involved. I know that Mr. Garcia did

improper work for a resident on the 700 block. and Mr. Montoya did improper work for a resident on the 900 block. If I had a list of the 700 block and 900 block residents of Quail Run I could identify the exact residents involved. who then could be interviewed to confirm these matters.

L)    This information provides another reason for both Mr. Montoya and Mr. Garcia to blame me for their independent decisions to keep workers out on April 19. Apparently the two learned that I was questioning my crew about their activities. and watching the two men's work closely in order to verify what I had been told. Thus. the two men killed two birds with one stone. removed the threat to their conflict-of-interest. under-the-table contracting activities (self-help to secure proper pay for their work). while excusing their own behavior in staying out on April 19 by blaming the supervisor you hired to manage them. me.

M)    Shortly after I engaged an attorney to complain about my termination – he complained specifically of all of the above practices in writing on June 11 and June 29, 2021 (they are attached hereto as *Exhibit C* and *Exhibit D*) -- the Board and Mr. Stetson apparently rewarded Mr. Montoya and Mr. Garcia for workplace sabotage and conflict-of-interest/under-the-table contracting by appointing them the acting supervisors of the maintenance/engineering department. at least they were moved into his old office. How is this action justifiable – two men stay out of work without excuse. blame their boss for their behavior. arrange the termination of their boss. and get promoted? How is it justifiable. at all. for two employees to blame their boss for them not coming to work their scheduled shifts? Apparently the Quail Run Board excused their improper. independent actions, against all rationality. by believing that I had some sort of magical power to influence my crew. I did not. For the sake of argument -- assume I told the two men I was in utter rebellion against Quail Run. our mutual employer – and organized a walk-out on Monday. Isn't the only policy-correct action for Mr. Montoya and Mr. Garcia to go to Facilities Director James Lente, and tell Mr. Lente that I had lost my mind? And then come to work on April 19. How on earth was not reporting my alleged disloyal behavior not a discipline offense. let alone a way to secure promotion?

N)    Shortly after my attorney's letters of complaint – meaning approximately June 15. 2021 -- I learned that Mr. Stetson was no longer employed by Quail Run. Further. a Human Resources Director was hired as well. someone who I heard was Hispanic/Latinx. And finally. Mr. Montoya and Mr. Garcia were left working for Quail Run Maintenance. and a different Hispanic replacement (Randy Sanchez) was hired to take my old job. Mr. Sanchez quit that new job after working less than a month perhaps because he refused to tolerate Quail Run's illegal pay practices. routine disrespect. and his lack of management control over the Department he was supposedly running. At no time, though

i)    Mr. Stetson either resigned or was terminated immediately following my complaint of discrimination against Hispanics – and though a Human Resources Director was hired. and neither Mr. Montoya nor Mr. Garcia were promoted – I was not brought back to work. A few weeks later. I heard that the maintenance department had terminated no employees other than me related to the incident. and instead -- again following my complaints about the lack of supervisory time I had when Maintenance Manager -- had hired three new Maintenance workers. Finally. I also heard that Mr. Lente's assistant – Candy Grimes -- had been terminated/resigned from her position shortly thereafter.

O)    I also should mention that, as explained below, there was a change of Facilities Managers while I was the Engineering/Maintenance Manager which occurred several months before I was terminated. I worked for a period of months as the untitled Facilities Manager between David Pfeiffer's resignation and James Lente's hire for that position. I accomplished all Quail Run's goals for that period, and never received any management complaints during that period. I even negotiated out additional compensation for that work. Nevertheless, and despite my State experience running much bigger facilities than Quail Run, Mr. Lente was hired over me despite my application for the position, the fact that I was an internal promotion and not an initial hire, and despite my belief (as I was obviously not included in the hiring discussions) that Mr. Lente has nothing near my experience demonstrating competency over the variety of issues a Facilities Manager has to address. Again, as always, I was disrespected by Quail Run, and treated as someone less qualified, despite their experience of me competently handling the position, and a career which demonstrated I was more-than-qualified to be Quail Run's Facilities Manager. I also want all concerned to know that Mr. Pfeiffer placed a photo of a monkey with my name "Steve" under it on the computer screen of the digital time clock where all my employees and I would punch in at the same time. I took a slightly blurry photo of that screen as soon as I saw it and kept it in my phone. The photo's digital properties show I took the photo on April 15, 2019 at 12:02 pm. My attorney can forward the digital photo to NMHRB by email as soon as this Charge is filed, and my attorney knows the Civil Rights Specialist handling my Charge. I questioned my employees about the photo and they told me that Mr. Pfeiffer had created the photo and placed it within the digital program, something my employees found humorous for a long time. I then complained to David Pfeiffer about the photo on the screen, and he stated that he placed the photo on top of my ISolved Pay Day HCM (the Application Quail Run uses to manage payroll) profile to create the photo, and he began laughing indicating that he thought it was funny and a joke. I then told him it was no joke and to please remove it (because I had no access to that part of the timekeeping program) however, Pfeiffer kept the photo on the screen. Furthermore, I also complained immediately thereafter about the photo to Mr. Pfeiffer's supervisor, Dale Stetson, and he told me that he would take care of it, but it remained on the screen so I went back to him a bit later and complained to him again. However both my direct supervisor and Quail Run's General Manager kept the monkey photo on my digital time keeping screen up and until my last day at Quail Run in 2021, approximately two years later.

P)    There were literally more than a hundred times my suggestions, complaints, offers of management advice and preferences were ignored by General Manager Stetson, and Facilities Directors Pfeiffer and Lente. I will be happy to talk about all these specific matters at any time.

8)    It is clear from the sequence of Quail Run's decision-making process that:

a)    The investigation never developed sufficient facts for Mr. Stetson and the Board to make accurate decisions regarding that April 19 walk-out. The investigation (again convened with the event and concluded by April 21) artificially shut down without conclusive evidence, which could have been cured by bringing in other informed voices (not meaning former Facility Manager David Pfeiffer, who had resigned five months before the investigated events);

b)      The investigation is also fatally flawed because I was interviewed first, and never confronted with the totality of the information gathered during the investigation. Doing so would have given me more opportunity to contradict myself, and a direct reason to raise the issues addressed in my attorney's letters. It's also standard investigative procedure to re-interview the target of any investigation as the final act of the investigation;

c)      Mr. Pfeiffer was apparently interviewed by the investigator as well, related to events he had no knowledge of because he resigned about five months before April 19, 2021. In early November 2020, I approached then-Quail Run Facilities Manager Pfeiffer related to information that Mr. Pfeiffer – who is the former Santa Fe City Facilities Manager and who resigned from that previous position after allegations of self-dealing emerged against him within City management. He had his house painted by Quail Run's painting contractor, Extreme Painting, in return for Mr. Pfeiffer's influence over the contracting decision. I brought the allegation -- made by an Extreme Painting employee -- to Mr. Pfeiffer out of loyalty and respect for the chain of command. Shortly after that conversation (meaning within the week), Mr. Pfeiffer had resigned his position with Quail Run. It is unknown at this point if Quail Run had notice of the free painting, but the inclusion of non-employee Pfeiffer in the investigative interview pool raises that concern, as well as confirming my belief of the retaliatory motivation underlying the investigation; and

d)      The investigation also suffered because the investigator was an English-only speaker, and several of the crew has little to no English-speaking skills.

All of the above is a mirroring of what I said before – with one hundred employees Quail Run needed in-house Human Resources direction, not outside contract help.

9)      What is reflected in the totality of the above is a massive breach of my trust in Quail Run. I supervised a crew of 13 employees working throughout the days all over the very-sizeable Quail Run property. Instead of giving me the ability to supervise the Department's activities, Quail Run staffed the Department at a minimal level, forcing me to work physically throughout the day – doing the work another employee (if there was one) should have done. Thus, hiring even one more person would have given me the ability to truly supervise my staff, rather than simply being the best, most motivated worker among them. Because thirteen employees were regularly doing ten different jobs at the same time, I should have been driving around the property, popping up regularly throughout the day at each work-site. Then my crew would have felt they had to do their best work to escape correction. Instead, Quail Run failed to support me enough to do what should have been my real job – supervision. At the same time, and directly leading to my termination, Quail Run, -- including specifically Mr. Stetson, current Facilities Director James Lente, and Mr. Lente's predecessor in the position, Dale Pfeiffer – regularly ignored my complaints of worker dissatisfaction regarding fair compensation, letting a systemic problem fester -- and leaving me to contain the on-going fall out. Because I could not adequately supervise my employees, and could not secure them fair compensation, Quail Run senior management caused Mr. Montoya and Mr. Garcia to form their own protest -- a work walk-out without management (meaning specifically, my) knowledge. I made an error of judgment in failing to react to notice of two potential workplace absences by attempting to dissuade the disgruntled workers, rather than over-react to what I believed was a joke. I did not

9

sabotage my workplace (against my own best interests), and Quail Run absolutely failed to do what most employers do instinctively – back their own managers, meaning me. Instead, hoping the problem would go away, and with an incomplete, procedurally-defective and inconclusive investigative report in hand, the Board with Mr. Stetson's guidance voted to discipline the precisely wrong person – myself – and temporarily promoting the two-maintenance employees causing me my largest problems, Mr. Montoya and Mr. Garcia. At the heart of what happened on April 19 is Quail Run's ignorance of the concerns of its Hispanic staff, ignorance of the character of the individual employees' involved, and ignorance of the actual demands of the job Quail Run hired me to perform. I trace this back to the systemic discrimination in place at Quail Run, reflected in a sight that confronts everyone attending every Board and Management meeting – it's simply a group of well-off Anglos insisting (without real knowledge or sensitivity) that another authority-less Hispanic babysit the staff I worked among, rather than giving me the tools to do a great job. I rely on the following non-exclusive list of factors to conclude discrimination motivated my termination and lost promotion:

    a)    the near pure white permanent residents;

    b)    the resulting pure white Board;

    c)    the resulting near pure white management team;

    d)    my nearly all Hispanic work crew, and the Housekeeping Department's nearly all Hispanic work crew, managed by the only other Hispanic Manager at Quail Run when I was there;

    e)    an atmosphere of corruption at Facilities, which was present before I arrived and I tried unsuccessfully to oppose and correct;

    f)    a procedurally and substantively defective investigative report;

    g)    no on-site Human Resources supervision; and

    h)    evidence of discrimination pervading Quail Run's hiring, promotion, compensation and discipline decisions, specifically including my own termination and lost promotion.

    i)    the change of management course and many management personnel after my attorney's letters of complaint; and

    j)    the monkey photo with my name under it being placed on the time clock by my Anglo direct supervisor, and then never removed despite my complaints to both my direct supervisor and his supervisor, Mr. Stetson.

With regard to Quail Run's retaliation against me for complaints and opposition to Quail Run's discriminatory practices, the following non-exclusive list of factors evidence that retaliation:

    i)    my complaints about Quail Run's failure to promote me;

    ii)    my complaints about paying my near-all-Hispanic work crew minimum or close to minimum wage, when many of that crew could command twice as much or more on the open Santa Fe market;

    iii)    my complaints about the failure to take me and my supposed position seriously;

    iv)    the acceptance of my attorney's complaints evidenced by the change of course in management behavior which followed those complaints, but the failure of Quail Run to re-hire me when my attorney was suggesting that to them;

    v)    the failure of Quail Run to discipline Mr. Montoya or Mr. Garcia, despite the apparent acceptance of my attorney's complaints; and

vi)    calling former Quail Run Facilities Manager as a witness to an investigation of an incident which occurred after I believe I secured his resignation from Quail Run because he did not want me to take my knowledge of his free paint job to Mr. Stetson.

10)    Overall, the totality of the evidence suggests that Anglos give the orders within Quail Run, and Hispanics carry them out. Hiring Hispanic supervisors within the two departments doing the most physical labor within your organization, then, is a symptom of the universal discrimination Quail Run inflicts upon Hispanic/Latinx employees. Any Hispanic supervisor, like myself, is hired and retained as a supervisor only if they can keep a lid on the effects of the discrimination on their primarily Hispanic employees. Because of Quail Run's failure to support my supervisory efforts and complaints of under-paying my crew, I was unable to keep that lid clamped down. The "walk-out" and my termination, my lost promotion, and the national origin of my apparent replacement (who quit shortly thereafter) all derive from the same source – the near universal discriminatory treatment Hispanics suffer within Quail Run as whole – from residents to Board to supervisors to employees. Instead of fixing the issues at maintenance, Quail Run perpetuated and intensified them now by, first, promoting two of my supervisees who each have demonstrated histories of disloyalty and dishonesty which directly infected Quail Run's discipline process. And then, second, hiring, but not being able to retain, my Hispanic/Latinx replacement Randy Sanchez, or re-hiring me.

11)    The genesis of the investigation of my alleged offenses creates questions here as well. I was told a few days following the "walk-out" by then-General Manager Stetson that me and my crew were doing a great job, all was well, and that they should pick a day when Stetson would buy them lunch. Then, apparently, the Board was given control of the situation, and Anglo Board Member Lacondra told the Board an investigation should be done, and apparently the Board voted in favor of the investigation, and then the all Anglo Board subsequently voted to terminate me. Prior to that decision and while I was at Quail Run, the Board did not interfere in employment matters, and allowed Mr. Stetson to manage his employees himself, so the entire course of the decision to investigate (after Mr. Stetson had reached a conclusion that left me working), the investigation itself, and the vote to terminate me disturbs me greatly. It was more special treatment reserved for one of Quail Run's two Latinx or Hispanic supervisors.

12)    The FLSA claims and discrimination claims are considerably intertwined precisely because I had absolutely no discretionary authority to do anything but approve work already completed in my position as Maintenance Manager, something untrue for the Anglo managers. I did not hire or fire or discipline anyone. I did not interview anyone. I did not schedule the work or the workers or determine what work was to be done. I had no input into the compensation of my crew. I did not make the assignments of my "supervisees" work and did not even assign myself my own work. I worked 90% of my time at physical labor, some 8% of my time checking the physical work of others, and the only administrative tasks I had was providing the Maintenance Department employee evaluations to the staff and approving regular supply purchases by my staff, which accounts for the other 2%. These factual issues have been a part of this claim since my attorney's first complaint letter to Quail Run. I was a manager only in name, and was not even officed with all of the rest of the management team upstairs. I estimate I spent less than 30 minutes a day in that office, and that was mostly to receive correspondence and orders from others.

13)   In short, despite my demonstrated competency in handling much more difficult and extensive facilities than Quail Run has, I was never treated as a full manager by Quail Run, was not promoted when I should have been, and was ultimately terminated.  I was an errand boy despite being termed a "manager."  I was less than a work foreman.  I was a babysitter, and one with no time to babysit because I was so busy physically accomplishing maintenance tasks.  They hired me to be a manager and never let me manage.  They hired someone less experienced than myself to kick me out of my acting Facilities Manager position.  They refused to listen to my on-going criticism of my workers, Mr. Montoya and Mr. Garcia, and wanted to promote them into the position I was wrongfully terminated from.  I endured a regular and on-going harassing environment when I worked as a manager, harassment which was subtle, but systemic and pervasive.  I recognized it when I saw how well the Anglo managers were treated when compared to me.  Every time I wanted to assign work on my own, or write my department's schedule, or participate in a hiring interview, or determine the priority of work to be done – meaning essentially every second of every day I worked as the Engineering/Maintenance Manager for Quail Run – I directly encountered that hostile work environment simply because I was Hispanic/Latinx.  That's precisely why I think my Hispanic replacement quit.  He could not endure the professional disrespect I dealt with for two-and-a-half years for more than a week or two.

Steve Martinez

Signature Date 1/13/2022

12